STATE OF NORTH CAROLINA v. DESMOND KEITH CARTER

No. 319A93

(Filed 8 December 1995)

**1. Criminal Law § 1337 (NCI4th)— capital sentencing—prior violent felony—instruction—personal violence by defendant—supporting evidence—absence of prejudice**

The trial court's isolated reference to defendant's personal threat or use of violence in its instruction on the prior conviction of a violent felony aggravating circumstance did not require the jury to find that defendant personally threatened or used violence during a prior robbery in order to find the existence of this circumstance where language in other portions of the instruction and on the issues and recommendation form properly referred to a "felony involving the use or threat of violence to the person." However, evidence that defendant had a gun and inflicted physical violence on the robbery victim was sufficient to support this aggravator even under an instruction requiring personal violence or threats by defendant, and the instruction, even if incorrect, had no probable impact on the jury's sentence recommendation. N.C.G.S. § 15A-2000(e)(3).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**2. Criminal Law § 680 (NCI4th)— capital sentencing—mitigating circumstance—peremptory instruction**

The trial court did not err by giving the pattern peremptory instruction that the jury should find a mitigating circumstance "if one or more of you finds the facts to be as all the evidence tends to show" rather than giving defendant's proposed instruction that "all of the evidence shows that this is true." The court's instruction properly left the credibility determination to the jury and permitted individual jurors to disbelieve the evidence if they so chose.

**Am Jur 2d, Trial § 1441.**

**3. Criminal Law § 1341 (NCI4th)— capital sentencing—pecuniary gain aggravating circumstance—sufficiency of evidence**

The State's evidence was sufficient to support the trial court's submission of the pecuniary gain aggravating circumstance in a capital sentencing proceeding where it tended to show that, although defendant said he initially asked the victim to "lend him money," defendant then stabbed the victim when she refused to give him money, and after killing her, he stepped over her dead body, took fifteen dollars the victim had placed beside a telephone, and went to buy cocaine. N.C.G.S. § 15A-2000 (e)(6).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

**4. Criminal Law § 1313 (NCI4th)— capital sentencing—question by prosecutor—no insinuation of parole possibility**

The prosecutor's question in a capital sentencing proceeding during cross-examination of defendant's counselor while he was in a New York prison asking if she had an opinion as to whether defendant would be able, "if given some opportunity at some point, to abide by the law" did not improperly insinuate that defendant might later be released from prison on parole where the question was directed toward defendant's ability to adapt to prison life if given a life sentence. Further, the court's sustaining of defendant's objection to the question advised jurors that they should not consider the question.

**Am Jur 2d, Trial §§ 575, 576.**

**Prejudicial effect of statement of prosecutor as to possibility of pardon or parole. 16 ALR3d 1137.**

**Prejudicial effect of statement by prosecutor that verdict, recommendation of punishment, or other finding by jury is subject to review or correction by other authorities. 10 ALR5th 700.**

**5. Criminal Law § 680 (NCI4th)— capital sentencing—mitigating circumstance—uncontradicted evidence—peremptory instruction**

In a capital sentencing proceeding, when submitting to the jury uncontradicted evidence supporting a mitigating circumstance, the appropriate device is a peremptory instruction rather than a directed verdict. Therefore, the trial court did not err in giving a peremptory instruction on two statutory mitigating circumstances rather than defendant's proposed "directed verdict peremptory instruction."

**Am Jur 2d, Trial § 1441.**

**6. Criminal Law § 680 (NCI4th)— capital sentencing—nonstatutory mitigating circumstances—peremptory instruction—mitigating value—insufficient evidence**

The trial court did not err by refusing to give defendant's proposed peremptory instruction on the nonstatutory mitigating circumstances that he responds well to a structured environment such as prison and relates well to jail and prison staff where the proposed instruction required jurors to assign mitigating value to nonstatutory mitigating circumstances. Further, the evidence to support these mitigating circumstances was not uncontradicted and thus would not have entitled defendant to a peremptory instruction where there was evidence that, while defendant was in prison in New York, it was not until defendant realized that good behavior and participation in prison programs would expedite his release that he began conforming to the requirements of the system, and a county jailer testified that while defendant was awaiting trial on the current charges, he was assigned to move defendant to another cell, defendant refused to comply and told the jailer he would need more deputies, and defendant acquiesced only after the jailer called for help.

**Am Jur 2d, Trial § 1441.**

**7. Criminal Law § 1373 (NCI4th)— death sentence not disproportionate**

A sentence of death imposed upon defendant for first-degree murder was not excessive or disproportionate to the penalty imposed in other cases, considering both the crime and the defendant, where the jury convicted defendant under both the felony murder rule and the theory of malice, premeditation, and

STATE v. CARTER

[342 N.C. 312 (1995)]

deliberation; the victim was killed in her own living room in the middle of the night; defendant chose to kill a person who had treated him with kindness and compassion, for whom he had done yard work in the past, and who had been his neighbor for quite some time; defendant stabbed the victim over thirteen times with an eight-inch butcher knife; one of the stab wounds penetrated to a depth of six inches, and at least three others were four inches deep or more; the victim was a seventy-one-year-old woman who suffered from cancer and arthritis, and defendant was a healthy twenty-four-year-old man; and defendant killed the victim for fifteen dollars to enable him to buy crack cocaine which he smoked while she lay dead on her living room floor.

**Am Jur 2d, Criminal Law § 628.**

Appeal of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by McHugh, J., at the 21 June 1993 Criminal Session of Superior Court, Rockingham County, on a jury verdict finding defendant guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment for robbery with a dangerous weapon was allowed 27 September 1994. Heard in the Supreme Court 12 September 1995.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, for defendant-appellant.*

WHICHARD, Justice.

Defendant was tried capitally for the first-degree murder and robbery with a dangerous weapon of Helen Purdy, his neighbor. The jury found defendant guilty on both charges and recommended a sentence of death for the first-degree murder. The trial court sentenced accordingly on the murder charge and sentenced defendant to forty years in prison for the robbery, to begin at the expiration of the murder sentence or "any judgment in place of" it. We hold that defendant had a fair trial, free of prejudicial error, and that the sentence of death is not disproportionate.

The State's guilt-phase evidence tended to show the following:

The victim, Helen Purdy, was a seventy-one-year-old resident of Eden, North Carolina. She lived alone beside the home of defendant,

his grandmother, and his uncle. Because of her fragile health, friends and family members took turns looking after and checking in on her. On 9 March 1992 Gchuther Morris, Mrs. Purdy's sister-in-law, tried calling Mrs. Purdy all day and became concerned when she did not get an answer. Around 9:15 p.m. Linda Purdy, Shirley Gray, and Ralph Carter went to Mrs. Purdy's house. They found her dead on her living room floor, lying in a pool of blood. Aside from the front door being unlocked, everything in the house generally appeared in order; there was no sign of a struggle. In Mrs. Purdy's bedroom the bed covers were turned back to one side, as if someone had been lying on the bed, and Mrs. Purdy's purse was lying open on the bed.

Dr. Robert L. Thompson, the forensic pathologist who performed the autopsy, found thirteen cut and stab wounds as well as numerous minor cuts and abrasions to Mrs. Purdy's hands, neck, and face. The significant findings included: (1) two incised or cut wounds in the victim's right chest, both with depths of $4\frac{3}{4}$ inches, one penetrating the pericardium sac and the other the liver; (2) two incised or cut wounds in the left chest with depths of $4\frac{1}{2}$ inches and 6 inches, again penetrating the pericardium sac and liver; (3) two incised or cut wounds in the left armpit with depths of 6 inches and $3\frac{1}{2}$ inches; (4) wounds to the back of the left arm, two of which went completely through the arm; (5) a small abrasion of the lower lip; (6) a superficial one-inch-long cut in the area of the left ear and a one-half inch cut below the angle of the jaw on the left side; (7) scratches and cuts on both wrists; (8) a $5\frac{1}{8}$ inch cut on the left first finger, described as a defensive wound; and (9) a large incised wound in the left side of the neck measuring 4 inches down to the bone. Dr. Thompson opined that death was caused by the wounds to the chest, none of which would have been instantly fatal. It would have taken several minutes for death to occur.

Nadine Carter, defendant's grandmother, testified that on the morning of 9 March 1992, defendant had called her into his room and told her he needed to go to the hospital. He said he had been accosted by four young white males at the car wash when he was coming home the night before and had been stabbed in the leg. Defendant had a towel wrapped around his leg. When Mrs. Carter looked at defendant, she knew something was not right, but she believed his story and did not question him further. She then drove defendant to Morehead Hospital.

Mary Hertle, an emergency room employee of Morehead Hospital, was on duty on 9 March 1992. Defendant came to the emergency room around 8:30 a.m. reporting a puncture wound two or three inches deep to the left inner thigh. Defendant said four white men had assaulted him at the car wash the previous night. Although defendant smelled of alcohol and said he did not come earlier because he was too drunk, Hertle observed that defendant did not appear intoxicated or in pain, his speech was not slurred, and he gave what appeared to be appropriate answers to questions.

Mark Joyce, an Eden police officer, also saw defendant at Morehead Hospital that morning. Defendant told him essentially the same story about his leg wound. In Joyce's opinion, although defendant had been drinking and there was a strong odor of alcohol about him, defendant was not impaired.

Greg Moore, an Eden Police Department detective, was assigned to investigate the murder. He had seen defendant on crutches on 9 March 1992 at the magistrate's office and knew defendant was reporting a knife wound to his leg. Detective Moore also knew defendant lived beside the victim. At approximately 8:40 a.m. on 10 March 1992, Detective Moore and SBI Agent James Bowman interviewed defendant at the Rockingham County jail. At that time, defendant was incarcerated on another charge for which he had been arrested on 9 March 1992. In substance, defendant initially gave these officers the following version of the events leading to his leg wound. Defendant said three white men had jumped him on Monday, 9 March 1992, about 4:30 or 5:00 a.m. He had been riding around and drinking with his friends, Quentin Broadnax and Jamel Price. After Broadnax dropped him off, defendant walked around before stopping at the corner of Henry and Early Streets. Defendant said he "threw up" at this time. Defendant then sat on the steps at the YMCA for a few hours. He said he may have dozed off.

According to defendant, he had been drinking beer and liquor for most of the day and evening. After leaving the YMCA steps, defendant walked up Monroe Street towards home and was in the car wash parking lot when he saw some people getting into a truck. He could tell they were white males. The truck was directly across the street from Mrs. Purdy's house. He said he tried to cut through the lot to avoid them, but they pulled toward him and began shouting obscenities. When defendant hollered back, the men stopped the truck and began chasing him. Defendant tried to run, but they caught him, and

he was too drunk to defend himself. As one man came up on his left side, defendant tried to kick him but got stabbed in the left leg in the process.

In the course of this interview, Detective Moore was advised that defendant had a doctor's appointment at 9:45 a.m. Prior to leaving for the appointment, defendant signed a consent to have a blood sample drawn. Following the doctor's appointment, Moore and Bowman again interviewed defendant. Prior to commencing the second interview, defendant was told a butcher knife had been found in the lot near his residence. Thereafter, defendant confessed to the officers and gave a new statement. Detective Moore testified that defendant told the officers he went to the home of Helen Purdy in the early morning hours of 9 March 1992. He had been drinking and using cocaine and wanted to borrow money from Mrs. Purdy. Mrs. Purdy let defendant into her home and initially told him he could borrow five dollars. She then changed her mind and said he could not have any money. Mrs. Purdy then went towards the telephone, whereupon defendant asked her not to call his grandmother. Defendant stated that at that point Mrs. Purdy noticed defendant had a knife, and she became excited. She tried to push defendant, and in the process the knife went in her. Defendant pulled the knife out and stuck it in his own leg. Defendant said he did not know what happened after he cut himself and did not know how many times he stabbed Mrs. Purdy. Prior to going home defendant took fifteen dollars that Mrs. Purdy had placed near the telephone and used it to buy cocaine. He then threw the knife into a field next to his house. Agent Bowman testified that blood drawn from defendant the day after the murder was not tested for alcohol or drug content.

The State introduced a knife found across the street from the murder scene. Lieutenant Walter Johnson testified that the knife was found on the grass in plain view and that no effort had been made to hide it. Blood of Mrs. Purdy's type was found on the knife. Mrs. Carter identified the knife as one from her kitchen.

Denise Smith, a girlfriend of defendant's at the time of the murder, testified that in the summer of 1991, she asked defendant if he used cocaine or any other drug. Defendant said "no" but told her that if a person is arrested, he should say he was under the influence of drugs and he would get a lighter sentence. After defendant was arrested for Mrs. Purdy's murder, Ms. Smith visited defendant in jail. While in the presence of another detainee, defendant commented he

had been to a mental health appointment. When the other detainee mimicked *The Twilight Zone* tune, defendant stated, "Man, I'm not crazy."

Defendant also presented evidence. Jamel Price, defendant's friend, testified that he and defendant spent the day together on 8 March 1992. Defendant began drinking at approximately 12:30 p.m. that day. Price and defendant visited various establishments in Reidsville; and Price watched defendant consume more than one hundred ounces of beer, some wine, and some liquor. Price did not see defendant take drugs, but he was not with him all the time.

Another companion, Quentin Broadnax, gave a similar account. On cross-examination Broadnax said that they went to defendant's house before going to Reidsville and that he believed defendant got five dollars from Mrs. Carter.

Defendant testified in his own behalf. He said he spent the day on 8 March drinking beer, wine, and bootleg whiskey. He also consumed a twenty-five dollar bag of powder cocaine, a twenty dollar rock of crack cocaine, and two pills which he identified as "Zannex." During the early morning hours of 9 March, he had wanted to buy cocaine. Although he had fifty or sixty dollars on him, he wanted to borrow more so he could get as much cocaine as possible. Mrs. Purdy's light was on, so he went to her door to ask for money. The remainder of defendant's testimony corresponded with the confession he had given to Detective Moore and Agent Bowman.

Defendant presented other evidence tending to show that he was mentally impaired at the time of the murder and that he had had a tumultuous childhood. Dr. John Warren, a clinical psychologist who examined defendant after his arrest, testified that defendant had a low average IQ and suffered from a borderline personality disorder as well as a substance-abuse problem. He opined that defendant's mental capacity was diminished at the time of the offense, making it very unlikely that he could make and carry out a plan to kill.

During the sentencing phase, the State introduced evidence concerning the facts and circumstances of defendant's prior conviction for second-degree robbery. Darwin Neely, the victim of that robbery, testified that in March 1986 defendant and three other men abducted him, forced him into a car at gunpoint, stole his money and personal items, and temporarily held him hostage. All four men had guns. The State introduced a certified copy of a judgment from Nassau County

Court, State of New York, which had been entered upon defendant's plea of guilty to second-degree robbery. Defendant served four years in prison for that offense.

Defendant's penalty-phase evidence tended to show that he was well behaved, kind, and loving. Dr. Warren testified that defendant was under the influence of emotional disturbance at the time of the crime and that his ability to appreciate the criminality of his conduct was impaired. Dr. Warren found that defendant would benefit from a structured environment, had done well in prison before, and did not have disciplinary problems. Lucy Moriello, a counselor with the New York Department of Corrections for eleven years, characterized defendant's time in prison in New York as good conduct, with appropriate behavior and no disciplinary problems.

On rebuttal, the State presented evidence of defendant's insolence while being held pretrial at the Rockingham County jail.

Prior to the presentation of any evidence, counsel for defendant conceded that defendant had stabbed and killed Mrs. Purdy, but contended that it was second-degree murder, not first. The jury found defendant guilty of first-degree murder on the theories of premeditation and deliberation and felony murder. It also found him guilty of robbery with a dangerous weapon. At the capital sentencing proceeding, the jury found as aggravating circumstances that the crime was committed for pecuniary gain and that defendant had been previously convicted of a felony involving the use or threat of violence. The jury rejected all proposed statutory mitigating circumstances and found three of the eleven nonstatutory mitigating circumstances submitted. It unanimously recommended a sentence of death, which the trial court accordingly imposed.

[1] Defendant's assignments of error all pertain to the sentencing phase. First, defendant argues that the trial court erred in submitting the prior violent felony aggravating circumstance, N.C.G.S. § 15A-2000(e)(3) (Supp. 1994), because the evidence did not support the circumstance as it was submitted to the jury. The trial court instructed the jury, in pertinent part:

If you find from the evidence, . . . beyond a reasonable doubt that on or about March 9th, 1992, the defendant had been convicted of second degree robbery and that the defendant threatened to use violence to the person in order to accomplish his criminal act and that the defendant killed Helen Moore Purdy after he committed

the second degree robbery, you would find this aggravating circumstance . . . .

Defendant contends that this instruction required the jury to find that defendant personally threatened or used violence during the prior robbery, and he argues that the evidence did not support such a finding.

The aggravating circumstance reads as follows: "The defendant had been previously convicted of a felony involving the use or threat of violence to the person." N.C.G.S. § 15A-2000(e)(3). Defendant concedes that this Court has previously interpreted this circumstance to require only that "the felony for which he was convicted involved the 'use or threat of violence to the person.' " *State v. Goodman*, 298 N.C. 1, 22, 257 S.E.2d 569, 583 (1979). He argues, though, that the trial court's instruction changed the theory of the circumstance by requiring a more exact showing that defendant himself threatened or used violence during the earlier robbery. We disagree.

Defendant did not object to the instruction at trial, so we review for plain error. *State v. Odom*, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983). This instruction, taken as a whole, would not have been viewed by a reasonable juror as limiting the aggravating circumstance so as to require a showing that defendant personally used or threatened violence. Early in the instructions, the court told the jury the issue was, "had the defendant been previously convicted of a felony *involving* the use or threat of violence to the person." (Emphasis added.) The issue was identically worded on the issues and recommendation form. A reasonable juror thus would not likely have interpreted an isolated reference to defendant's personal threat or use of violence as limiting the circumstance contrary to the clear wording in other portions of the instructions and on the forms submitted to the jury.

If the instruction could have been reasonably so construed, defendant is still not entitled to relief. The State presented substantial evidence that defendant did in fact threaten and use violence during the commission of the robbery. Darwin Neely, the victim of the robbery, testified that in 1986 four men, one of whom was defendant, seized him as he walked down a street in New York. They forced him into a car at gunpoint and told him he was going to be held overnight so he could not testify before a grand jury regarding a crime he had witnessed. Prior to his release, Neely's abductors stole several hundred dollars from his person, as well as his wallet and personal items

in his gym bag. Each of his abductors had a gun. Detective Gary Ferrucci, who investigated the Neely robbery, testified that defendant stated to him that he was holding a "BB type of gun" when Neely was abducted, that he "grabbed the guy and put him in the rear seat," and that he "tied [Neely's] hands behind his back." The physical violence defendant inflicted on the victim, along with the threat the presence of a gun created, was sufficient to support the aggravator even under the instruction defendant challenges. We thus cannot conclude that the instruction, if indeed incorrect, had a probable impact on the jury's sentence recommendation. This assignment of error is overruled.

[2] Next, defendant argues that the trial court erred in using the pattern peremptory instruction rather than defendant's proposed instruction regarding two statutory mitigating circumstances. Defendant's requested instruction read: "If you find the [described mitigating circumstance] exists, and I instruct you that all of the evidence shows that this is true, you would so indicate . . . ." The trial court's actual instruction was: "[A]s to this mitigating circumstance, I charge you that if one or more of you finds the facts to be as all the evidence tends to show, you will answer yes." Defendant contends the proposed instruction clearly calls the jury's attention to the fact that the court finds the evidence uncontradicted and substantial, whereas the instruction as given did not so alert the jury.

A peremptory instruction tells the jury that if it finds that the facts exist as all the evidence tends to show, it will answer the question put to it in the manner directed by the trial court. *Chisholm v. Hall*, 255 N.C. 374, 376, 121 S.E.2d 726, 728 (1961). Even when peremptorily instructed, however, jurors have the right to reject the evidence if they lack faith in its credibility. *State v. Huff*, 325 N.C. 1, 59, 381 S.E.2d 635, 669 (1989), *sentence vacated on other grounds*, 497 U.S. 1021, 111 L. Ed. 2d 777 (1990). The instant instruction properly left the credibility determination to the jury and permitted individual jurors to disbelieve the evidence if they so chose. Further, this Court has described the situation in which a peremptory instruction is appropriate in language virtually verbatim to that used here. *See State v. Johnson*, 298 N.C. 47, 76, 257 S.E.2d 597, 618 (1979). The instruction here is in conformity with that language and with the North Carolina Pattern Instructions relating to peremptory instructions for mitigating circumstances, and it fairly represents applicable legal principles. *See* N.C.P.I.—Crim. 150.10 (1995). Finally, "[n]either

statutory nor case law requires that the trial court's charge be given exactly in the words of the tendered request for instructions. It is sufficient if the trial court gives the requested instructions in substance." *State v. Avery*, 315 N.C. 1, 33, 337 S.E.2d 786, 804 (1985). The trial court here gave instructions in accord with the essence of defendant's request. This assignment of error is overruled.

[3] Defendant next argues that the State's evidence was insufficient to support submitting the pecuniary gain aggravating circumstance, N.C.G.S. § 15A-2000(e)(6). He contends that the essence of this circumstance is that the killing was for the purpose of getting money or something of value. Because he claims he intended only to borrow money, not to steal it, he asserts that the murder was not committed for pecuniary gain.

In determining whether there is sufficient evidence to submit an aggravating circumstance, the trial court must consider the evidence in the light most favorable to the State, and the State is entitled to every reasonable inference to be drawn therefrom. *State v. Syriani*, 333 N.C. 350, 392, 428 S.E.2d 118, 141, *cert. denied,* —— U.S. ——, 126 L. Ed. 2d 341 (1993). Applying these principles, the case is replete with evidence of defendant's intent to steal from Mrs. Purdy. The evidence showed that defendant was living on his grandmother's resources and wanted money prior to the murder. Although he said he initially asked Mrs. Purdy to "lend him money," the evidence shows that he stabbed her multiple times after she refused to give him any. After killing her, he stepped over her dead body, took her fifteen dollars from beside the telephone, and went to buy cocaine. This evidence clearly supported a finding that the murder was committed for the purpose of procuring money. Thus, the trial court properly submitted the pecuniary gain aggravating circumstance to the jury.

[4] Defendant next contends he was prejudiced by the prosecutor's questions insinuating that defendant might later be released from prison. During the penalty phase, defendant called Lucy Moriello as a witness to support his contention that he had adapted well to prison in New York and that he would also adapt well to prison if given a life sentence here. On cross-examination the prosecutor asked Moriello, "Do you have some opinion based on these occasions that you say you counseled with him as to whether or not he would be able to, if given some opportunity at some point, to abide by the law?" Defendant's counsel objected to the question. Although the objection was sustained, defendant nonetheless argues that the damage was

done because the possibility of release was communicated to the jury. We disagree.

A defendant's eligibility for parole is not a proper matter for the jury's consideration. *State v. Brown*, 320 N.C. 179, 201, 358 S.E.2d 1, 16, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987). However, here, as in *Brown*, the word "parole" was never used, and there was no mention of the possibility that a life sentence could mean eventual release. Rather, the question was directed toward defendant's ability to adapt to prison life if given a life sentence. In the context of the surrounding questions, the prosecutor's point was that Moriello did not know and could not predict how defendant would adjust in the North Carolina Department of Correction if given a life sentence. Further, the sustaining of the objection advised the jurors that they should not consider the question. *State v. Greene*, 285 N.C. 482, 495, 206 S.E.2d 229, 237 (1974). We therefore overrule this assignment of error.

At the sentencing hearing, psychiatrist Dr. John Warren testified that defendant suffered from borderline personality disorder, a low IQ, and substance-abuse disorder. Based on these three conditions, he opined that defendant suffered from mental or emotional disturbance at the time of the offense and was unable to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. The trial court accordingly submitted to the jury, *inter alia*, the corresponding mitigating circumstances in N.C.G.S. § 15A-2000(f)(2) and (f)(6). The jury unanimously rejected both. Defendant now argues that the trial court erred in refusing to give a "directed verdict peremptory instruction" on these circumstances. He contends that he is entitled to "a directed verdict on a given statutory mitigating circumstance if the evidence in support of the circumstance is substantial, manifestly credible and uncontradicted" and that such is the case here.

[5] While defendant states that he was entitled to a "directed verdict peremptory instruction," his request was actually for a peremptory instruction. The burden of persuading the jury on the existence of a mitigating circumstance is upon the defendant, and the standard of proof is by a preponderance of the evidence. However, where "all of the evidence . . . , if believed, tends to show that a particular mitigating circumstance does exist, the defendant is entitled to a peremptory instruction on that circumstance." *Johnson*, 298 N.C. at 76, 257 S.E.2d at 618. It is true that when a criminal defendant argues that the evi-

**STATE v. CARTER** ·

[342 N.C. 312 (1995)]

dence supporting a mitigating circumstance is uncontradicted, "his position is *analogous* to that of a party with the burden of persuasion seeking a directed verdict." *State v. Jones*, 309 N.C. 214, 219, 306 S.E.2d 451, 455 (1983) (emphasis added). He is essentially asking the trial court to conclude that "the evidence so clearly establishes the fact in issue that no reasonable inferences to the contrary can be drawn." *North Carolina Nat'l Bank v. Burnette*, 297 N.C. 524, 536, 256 S.E.2d 388, 395 (1979). While the evidentiary standard for a criminal defendant seeking a peremptory instruction may be the functional equivalent of the standard for a civil directed verdict, the two principles are distinct legal entities. In a capital sentencing proceeding, when submitting to the jury uncontradicted evidence supporting a mitigating circumstance, the appropriate device is a peremptory instruction.

Counsel for defendant made a timely written request for a peremptory instruction on the mitigating circumstances in N.C.G.S. § 15A-2000(f)(2) and (f)(6). Although not manifestly clear, it appears that while the trial court refused defendant's proposed instruction, it in fact agreed that defendant was entitled to a peremptory instruction on both circumstances. During the sentencing conference, in response to defense counsel's subsequent oral request for the instruction, the trial court stated, "I believe a [per]emptory instruction may be in order as to the two statutory factors which are being submitted. That is, committed while under the influence of mental or emotional disturbance and capacity to appreciate criminality of the conduct or conform his conduct." The trial court then stated that it would give the following instruction:

> The defendant has the burden of establishing this mitigating circumstance by the preponderance of the evidence as previously explained to you and as to this mitigating circumstance, I charge you that if one or more of you find the facts to be as all the evidence tends to show, you will answer yes to the mitigating circumstance on the issues and recommendations form.

This was not the language defendant requested. However, it embodied the substance of defendant's request and was a proper peremptory instruction. The jury's failure to find these statutory mitigating circumstances does not establish that the jury was prevented from considering or failed to consider them. To the contrary, these mitigating circumstances were submitted and properly instructed upon, and the jury thus was required to consider them.

STATE v. CARTER

[342 N.C. 312 (1995)]

**[6]** In a related assignment, defendant argues that the trial court erred in denying his request for a peremptory instruction on the non-statutory mitigating circumstances that he responds well to a structured environment such as prison and relates well to jail and prison staff. The requested instruction for these nonstatutory mitigators was the same as that which defendant requested concerning statutory mitigating circumstances.

We have stated:

[A]s to a proffered *nonstatutory* mitigating circumstance—unlike statutory ones—the jurors must first find whether the proffered circumstance exists factually. Jurors who find that a nonstatutory mitigating circumstance exists are then to consider whether it should be given any mitigating weight. Thus, a juror may find that a nonstatutory mitigating circumstance exists, but may give that circumstance no mitigating value.

*State v. Green*, 336 N.C. 142, 173, 443 S.E.2d 14, 32, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 547 (1994). Defendant's proposed instruction required jurors to assign mitigating value to nonstatutory mitigating circumstances. This is legally incorrect, and the trial court thus correctly refused to give the requested instruction.

Further, the evidence to support these proposed circumstances was not uncontradicted and thus would not have entitled defendant to a peremptory instruction if such was otherwise legally proper. Defendant's counselor, Moriello, described him as manipulative and as having come into prison with an arrogant attitude. Defendant's print shop instructor in prison noted that "inmate Carter has demonstrated a negative attitude in print shop." Another comment in defendant's prison records describes his attitude as belligerent. Defendant is quoted as stating that staying out of trouble in prison was hard for him. Prison records describe defendant as streetwise and jailwise and contain opinions that these traits may explain how he was able to avoid misbehavior reports. Dr. Warren testified that defendant was denied parole several times because he did not follow the recommendations and orders of the prison staff. Although defendant's records indicate that he showed improved behavior later, the thrust of the evidence was that it was not until defendant realized that good behavior and participation in prison programs would expedite his release that he began conforming to the requirements of the system. Consequently, there was evidence to contradict the proposed

**STATE v. CARTER**

[342 N.C. 312 (1995)]

nonstatutory mitigator that defendant was able to adapt well to the structured environment of a prison.

Rockingham County jailer William McClerken testified that while defendant was awaiting trial on the murder and robbery charges, McClerken was assigned to have him change cells. Defendant advised him that he would not comply and that if McClerken was going to move him, McClerken needed to get more deputies. It was only after McClerken called for help that defendant acquiesced. Therefore, the evidence that defendant related well to jail and prison staff likewise was not uncontradicted, and the trial court thus properly denied defendant's requested instruction. This assignment of error is overruled.

### PRESERVATION ISSUES

Defendant presents numerous preservation issues that, as he acknowledges, we have decided contrary to his position: (1) the trial court erred by using the word "satisfy" in its definition of the burden of proof applicable to mitigating circumstances; (2) the trial court erred by giving an unconstitutionally vague and overbroad instruction regarding the pecuniary gain aggravating circumstance; (3) the trial court erred in its instructions regarding nonstatutory mitigating circumstances because it allowed a juror to reject those he or she deemed to have no mitigating value; and (4) the trial court erred by giving an improperly restrictive definition of mitigation. Defendant presents no compelling reason to overrule our precedents on these issues.

### PROPORTIONALITY REVIEW

[7] Having found no error in either the guilt or sentencing phase, we must determine whether: (1) the evidence supports the aggravating circumstances the jury found; (2) passion, prejudice, or "any other arbitrary factor" influenced the imposition of the death sentence; and (3) the sentence is "excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." N.C.G.S. § 15A-2000(d)(2).

The jury found defendant guilty of first-degree murder under the theory of malice, premeditation, and deliberation, as well as under the felony murder rule. It also found him guilty of robbery with a dangerous weapon. At the capital sentencing proceeding the trial court submitted two aggravating circumstances, both of which the jury found: that defendant had been previously convicted of a violent

felony, N.C.G.S. § 15A-2000(e)(3); and that the murder was committed for pecuniary gain, N.C.G.S. § 15A-2000(e)(6). We conclude that the evidence supports both circumstances. We further conclude that the sentence of death was not imposed under the influence of passion, prejudice, or any other arbitrary factor. We therefore consider proportionality.

One purpose of proportionality review "is to eliminate the possibility that a person will be sentenced to die by the action of an aberrant jury." *State v. Holden*, 321 N.C. 125, 164-65, 362 S.E.2d 513, 537 (1987), *cert. denied*, 486 U.S. 1061, 100 L. Ed. 2d 935 (1988). Another is to guard "against the capricious or random imposition of the death penalty." *State v. Barfield*, 298 N.C. 306, 354, 259 S.E.2d 510, 544 (1979), *cert. denied*, 448 U.S. 907, 65 L. Ed. 2d 1137 (1980). We compare this case to others in the pool, which we defined in *State v. Williams*, 308 N.C. 47, 79-80, 301 S.E.2d 335, 355, *cert. denied*, 464 U.S. 865, 78 L. Ed. 2d 177 (1983), and *State v. Bacon*, 337 N.C. 66, 106-07, 446 S.E.2d 542, 563-64 (1994), *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 1083 (1995), that "are roughly similar with regard to the crime and the defendant." *State v. Lawson*, 310 N.C. 632, 648, 314 S.E.2d 493, 503 (1984), *cert. denied*, 471 U.S. 1120, 86 L. Ed. 2d 267 (1985). Whether the death penalty is disproportionate "ultimately rest[s] upon the 'experienced judgments' of the members of this Court." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

The trial court submitted four statutory mitigating circumstances: defendant had no significant history of prior criminal activity, N.C.G.S. § 15A-2000(f)(1); the murder was committed while defendant was under the influence of mental or emotional disturbance, N.C.G.S. § 15A-2000(f)(2); defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, N.C.G.S. § 15A-2000(f)(6); and defendant's age at the time of the crime, N.C.G.S. § 15A-2000(f)(7). Notably, the jury found none of these to exist. The trial court also submitted the "catchall" circumstance, N.C.G.S. § 15A-2000(f)(9), and the jury answered it in the negative. The jury found only three nonstatutory mitigating circumstances—that defendant confessed his guilt and cooperated with law enforcement officers, that his parents had failed to provide him with a nurturing and supporting relationship, and that his grandmother had tried to get substance-abuse help for him just prior to the crime. The jury determined that the aggravating circumstances outweighed the mitigating circumstances and recommended a sentence of death.

This case has several distinguishing features. The jury convicted defendant under both the felony murder rule and the theory of malice, premeditation, and deliberation. "The finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341, 384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990). Further, the victim was killed in her own living room in the middle of the night. A murder in the home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *Brown*, 320 N.C. at 231, 358 S.E.2d at 34. Defendant chose to kill a person who had treated him with kindness and compassion, for whom he had done yard work in the past, and who had been his neighbor for quite some time. Additionally, the evidence indicated that defendant stabbed the victim over thirteen times with an eight-inch butcher knife. One of the stab wounds penetrated to a depth of six inches, and at least three others were four inches deep or more. Finally, the victim was a seventy-one-year-old woman who suffered from cancer and arthritis. At 5'2½" tall and 119 pounds, she was no match for defendant, a healthy twenty-four-year-old man. Defendant killed her for fifteen dollars to enable him to buy crack cocaine which he smoked while she lay dead on her living room floor. These features distinguish this case from those in which we have held the death penalty disproportionate.

Defendant contends that this case is disproportionate because other robbery- and burglary-murder cases resulted in life sentences rather than death sentences. While we cannot distinguish all of those cases from this one, "the fact that one, two, or several juries have returned recommendations of life imprisonment in cases similar to the one under review does not automatically establish that juries have 'consistently' returned life sentences in factually similar cases." *Green*, 336 N.C. at 198, 443 S.E.2d at 47.

Defendant also contends this case is similar to *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985), one of the cases in which we found a death sentence disproportionate, and that his sentence must therefore be vacated. We disagree. In *Young* the defendant, age nineteen, and two companions went to the victim's home and robbed and killed him. Defendant stabbed the victim twice, and one of his companions "finished him" by stabbing him five or six more times. The three young men then stole money and valuable coins and fled the scene. The defendant's two companions were not tried capitally because

they received a plea bargain in exchange for testifying against the defendant.

The defendant's crime in this case is readily distinguishable from that in *Young*. In *Young* the aggravating circumstances found were that the murder occurred during a robbery and was motivated by pecuniary gain. Pursuant to *State v. Quesinberry*, 319 N.C. 228, 354 S.E.2d 446 (1987), these circumstances would now be held redundant, leaving only one aggravator as opposed to the two clearly discrete aggravators found here. The most obvious distinctions, however, are the ages of the defendants and their prior criminal histories. In *Young* there was no finding of a prior felony conviction, and the defendant was nineteen years old. Defendant here, by contrast, was twenty-four years old and had already served four years in prison for second-degree robbery. Additionally, the defendant in *Young* stabbed the victim twice, while the defendant here stabbed his victim more than thirteen times. These features distinguish this case from *Young* as well as from the six other cases wherein we have held the death sentence disproportionate: *State v. Benson*, 323 N.C. 318, 372 S.E.2d 517 (1988); *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *State v. Rogers*, 316 N.C. 203, 341 S.E.2d 713 (1986), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983).

Considering this crime and this defendant, particularly the features noted above, we conclude that the death sentence is not excessive or disproportionate. We hold that defendant received a fair trial and sentencing proceeding, free of prejudicial error.

NO ERROR.