STATE OF NORTH CAROLINA v. EDWARD ERNEST HARTMAN

No. 531A94

(Filed 11 October 1996)

**1. Constitutional Law § 344 (NCI4th)— capital murder—jury selection—judge's private conversation with juror—excusal for medical reasons**

A trial court's private, unrecorded conversation with a prospective juror outside defendant's presence in a capital first-degree murder prosecution was harmless beyond reasonable doubt. Assuming through inference that such a conversation occurred outside defendant's presence, defendant failed to object to the trial judge's reconstruction of his communications with the prospective juror and the prospective juror was properly excused for medical reasons.

**Am Jur 2d, Constitutional Law § 695.**

**Postretirement out-of-court communications between jurors and trial judge as grounds for new trial or reversal in criminal case. 43 ALR4th 410.**

**2. Jury § 190 (NCI4th)— capital murder—jury selection—denial of challenge for cause—preservation for appeal**

A defendant in a capital first-degree murder prosecution satisfied the mandates of N.C.G.S. § 15A-1214(h) for preserving an assignment of error from a denial of a challenge for cause during jury selection where defendant challenged a prospective juror for cause; the trial court denied the challenge; defendant exhausted his peremptory challenges and renewed his challenge for cause as to that juror; and the trial court also denied that challenge.

**Am Jur 2d, Jury § 335.**

**3. Jury § 205 (NCI4th)— capital murder—jury selection—acquaintance of victim and witnesses—ability to be fair and impartial—rejection of challenge for cause**

The trial court did not abuse its discretion during jury selection for a capital first-degree murder prosecution where a prospective juror was acquainted with the victim and prospective witnesses but never fluctuated in her clear and decisive answers to both the trial court and the prosecutor that she could remain a fair and impartial juror; when asked by defense counsel if she had

any opinion as to what defendant's punishment should be, she responded, "No, because I don't know all the facts"; and the trial court in its discretion made the decision to reject defendant's challenge for cause after hearing the juror's responses, observing her demeanor, and assessing her credibility.

**Am Jur 2d, Jury § 300.**

### 4. Criminal Law § 395 (NCI4th)— capital murder—jury selection—remarks by judge—clarification of ambiguous answer—not expression of opinion

The trial court did not express an opinion which might have improperly influenced other jurors and did not by its demeanor discourage other prospective jurors from disclosing any possible influence from factors outside the evidence during jury selection for a capital murder prosecution where one of the first twelve jurors seated stated that extrajudicial information could possibly influence his verdict. The trial judge alluded only to appropriate sources of evidence, in no way suggested how such evidence should be considered by the jurors, and did not convey any personal opinion which he may have had concerning the juror's sources of influence. The trial judge was simply clarifying an ambiguous admission by a prospective juror; it is mere speculation that the other prospective jurors were discouraged from disclosing any possible influence outside the evidence admitted at trial due to the trial judge's remarks.

**Am Jur 2d, Trial §§ 276, 277, 280.**

### 5. Criminal Law § 370 (NCI4th)— capital murder—scars on witness's wrists—judge's comment on relevancy

There was no prejudicial error in a capital murder prosecution where defendant's mother testified that she had attempted suicide by slitting her wrists thirty times, defense counsel requested permission for defendant's mother to show the jury her wrists, and the trial court said, "I guess so. I don't see how that's relevant, but step down and show them your wrists." Whether the witness had scars on her wrists was not a question of fact for the jury to decide and the trial court's comment was not directed at the relevance of her alleged suicide attempts as mitigating evidence, but more likely at the relevance of the witness having to show the jury the scars on her wrists as evidence of her suicide attempts. Furthermore, the trial court submitted and the jury

found as a mitigating circumstance that defendant witnessed physical and verbal abuse of his mother, her abuse of drugs and alcohol, and an attempted suicide; thus it is obvious that the trial court did not persuade the jury that the suicide attempts were irrelevant at the sentencing phase.

**Am Jur 2d, Trial § 280.**

6. **Criminal Law § 1363 (NCI4th)— capital sentencing—requested instructions—nonstatutory mitigating circumstances**

There was no prejudicial error in a capital sentencing proceeding by refusing to submit specific requested nonstatutory mitigating circumstances where defendant was not denied the benefit of any of his proposed nonstatutory mitigating circumstances. Those that were supported by the evidence were submitted to the jury in substance and those that were not supported by the evidence were not submitted to the jury. Viewed contextually, the substance of the mitigating circumstances that defendant requested were subsumed into other submitted mitigating circumstances, including the catchall mitigating circumstance, and the jury was not precluded from considering any of defendant's mitigating evidence.

**Am Jur 2d, Criminal Law §§ 598, 599.**

**Propriety, in imposing sentence for original offense after revocation of probation, of considering acts because of which probation was revoked. 65 ALR3d 1100.**

**What constitutes playing "mitigating role" in offense allowing decrease in offense level under United States Sentencing Guideline § 3B1.2, 18 USCS Appendix. 100 ALR Fed. 156.**

7. **Evidence and Witnesses §§ 764, 714 (NCI4th)— capital murder—questions as to defendant's sexual orientation— not answered—instruction to disregard statement**

There was no prejudicial error in a capital first-degree murder prosecution where the prosecutor asked the first twelve veniremembers whether someone's sexual persuasion would have any bearing on their decision and the court sustained defendant's immediate objection; the prosecutor asked defendant's aunt on cross-examination whether she had heard that

STATE v. HARTMAN

[344 N.C. 445 (1996)]

defendant was a homosexual; the trial court sustained defendant's objection and instructed the jury to disregard the statement; the prosecutor asked whether the aunt knew defendant's sexual persuasion; defense counsel objected and the trial court sustained the objection. The prosecutor's questions were never answered; moreover, our system is based upon the assumption that trial jurors are women and men of character and sufficient intelligence to fully understand and comply with proper instructions of the court not to consider certain evidence and they are presumed to have done so.

**Am Jur 2d, Trial § 1120.**

**8. Robbery § 138 (NCI4th)— capital murder and armed robbery—charge on larceny denied—no error**

The trial court did not err in a prosecution for first-degree murder and robbery with a firearm by failing to submit the lesser included offense of larceny where the State introduced substantial evidence of defendant's guilt of robbery with a firearm and there is no evidence to support defendant's contention that he formed the intent to take the victim's property at a time which could not be part of a continuous transaction.

**Am Jur 2d, Robbery § 75.**

**9. Criminal Law § 1357 (NCI4th)— capital sentencing—mitigating circumstances—mental or emotional disturbance—instructions—use of conjunctive**

There was no plain error in a capital sentencing proceeding in the trial court's use of the conjunctive in listing supporting evidence when instructing on the mitigating circumstance that the murder was committed while defendant was under the influence of mental or emotional disturbance. The instruction clearly comported with defendant's evidence, and the court also instructed the jury that it was enough that defendant's mind or emotions were disturbed from any cause and that he was under the influence of the disturbance when he killed the victim. The instruction did not preclude the jury from considering mitigating evidence.

**Am Jur 2d, Criminal Law § 599.**

**Modern status of test of criminal responsibility—state cases. 9 ALR4th 526.**

**What constitutes playing "mitigating role" in offense allowing decrease in offense level under United States Sentencing Guilldeline § 3B1.2, 18 USCS Appendix. 100 ALR Fed. 156.**

**10. Criminal Law § 1160 (NCI4th)— robbery—Fair Sentencing—aggravating factor—age of victim**

The trial court did not err when sentencing defendant for robbery by finding the aggravating factor that the victim was very old. Although defendant contended that there was no evidence that the victim was more vulnerable to the commission of the offense by reason of his age, the victim was somewhere between seventy-two and seventy-seven years old at the time of the murder; he suffered from emphysema and relied on inhalers at all times; he had limited use of one arm and weighed only ninety-three pounds at the time of the autopsy; and the victim had provided defendant with shelter, food, cigarettes, beer, and transportation when defendant had nowhere else to go. The victim's age, physical disabilities, and stature made him vulnerable and an inviting target for the physically superior twenty-eight-year-old defendant. N.C.G.S. § 15A-1340.4(a)(1)j (1988).

**Am Jur 2d, Criminal Law §§ 598, 599.**

**11. Criminal Law § 1373 (NCI4th)— death sentence— proportionate**

A sentence of death for a first-degree murder was not disproportionate where the evidence fully supports the aggravating circumstance found by the jury, there is no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration, the sentence of death was not disproportionate based on the nature of the crime, and this case is more similar to cases in which the death sentence was found proportionate than to those in which the sentence was found disproportionate or those in which juries have consistently returned recommendations of life imprisonment. The evidence tended to show that the victim, an elderly man with poor health, had befriended the twenty-eight-year-old defendant, taken him into his home, and offered him respect and goodwill; defendant took the victim's belongings and attained money by using his personal checks throughout several days following the murder while leaving the victim's body in the recliner in which he was murdered; and the victim was killed in the solace of his own home.

STATE v. HARTMAN

[344 N.C. 445 (1996)]

**Am Jur 2d, Criminal Law § 628.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was heinous, cruel, depraved, or the like—post-*Gregg* cases. 63 ALR4th 478.**

**Sufficiency of evidence, for purposes of death penalty, to establish statutory aggravating circumstance that murder was committed for pecuniary gain, as consideration or in expectation of receiving something of monetary value, and the like—post-*Gregg* cases. 66 ALR4th 417.**

Appeal as of right pursuant to N.C.G.S. § 7A-27(a) from a judgment imposing a sentence of death entered by Brown (Frank R.), J., at the 10 October 1994 Criminal Session of Superior Court, Northampton County, upon a jury verdict of guilty of first-degree murder. Defendant's motion to bypass the Court of Appeals as to an additional judgment imposed for robbery with a firearm was allowed 21 November 1995. Heard in the Supreme Court 16 May 1996.

*Michael F. Easley, Attorney General, by G. Patrick Murphy, Special Deputy Attorney General, for the State.*

*Malcolm Ray Hunter, Jr., Appellate Defender, by Staples Hughes, Assistant Appellate Defender, for defendant-appellant.*

ORR, Justice.

On 3 June 1993, twenty-eight-year-old defendant, Edward Ernest Hartman, shot Herman Smith, Sr., at close range in the back of the head while Mr. Smith was sitting in his recliner watching television. Mr. Smith was between seventy-two and seventy-seven years old, was in poor health, weighed only ninety-three pounds, and was suffering from emphysema at the time he was killed.

Defendant was indicted for first-degree murder and armed robbery and was tried capitally. Defendant was found guilty of first-degree murder based upon premeditation and deliberation and under the felony murder rule with robbery as the underlying felony. Defendant was also found guilty of robbery with a firearm.

Following a capital sentencing proceeding pursuant to N.C.G.S. § 15A-2000, the jury recommended a sentence of death for the first-degree murder conviction, and the trial court sentenced defendant

accordingly. The trial court also entered a prayer for judgment continued with respect to the robbery conviction. On 13 January 1995, judgment was entered on the robbery conviction, and the trial court imposed a sentence of forty years' imprisonment to run consecutive to the sentence of death for the first-degree murder conviction.

Defendant appeals to this Court, asserting sixteen assignments of error. For the reasons stated herein, we conclude that defendant's trial and capital sentencing proceeding were free from prejudicial error and that defendant's sentence of death is not disproportionate.

During the guilt-innocence phase of defendant's trial, the State presented evidence tending to show the following: Defendant and Smith became acquainted through defendant's mother, Dot Simpson, who had lived with and cared for Smith some years earlier in Virginia and then later in Northampton County, North Carolina. One year prior to the murder, after Ms. Simpson moved back to Virginia, defendant, who apparently had no place else to live, moved in with Smith.

In February or March 1993, defendant told a friend, Emory K. Phipps, that Smith was a millionaire and always carried between four and five thousand dollars with him. Defendant also told Phipps that he wanted to kill Smith in order to get some of his money.

Defendant was arrested for Smith's murder on 24 June 1993. Defendant gave two statements to the police after his arrest. In his first statement, defendant indicated to the police that Smith's death was the result of an accidental shooting. Defendant later recanted that statement and confessed in a second statement to murdering Smith.

In this second statement, defendant stated that on Thursday, 3 June 1993, he had been working in the yard and drinking beer all afternoon. Around 7:00 p.m., having consumed a twelve-pack of beer, he bought another twelve-pack and ate dinner with Smith. Smith showed defendant his .38-caliber revolver, and they discussed repairing the gun. At approximately 11:00 p.m., Smith was sitting in a recliner watching the news, and defendant was at a table with the loaded revolver about five to six feet behind him. By this time, defendant had consumed four beers from the second twelve-pack. Defendant stated:

Herman was sitting in a recliner in the den. I picked the gun up off the table, walked up behind Herman, pointed the gun at the back of Herman's head. The sight of blood makes me sick so I

turned my head and at very close range, pulled the trigger and shot Herman Smith in the back of the head.

Thereafter, defendant stated that he considered and decided against calling his mother or the police. Instead, he gathered the gun, the remaining beer, a change of clothes, his dog, and Smith's car keys, and leaving Smith's body in the recliner, drove in Smith's car to his (defendant's) mother's house in Norfolk, Virginia, for one day. Defendant's mother later testified that on 4 June 1993, the day after the murder, defendant asked her, "If Herman was to die, do you think you'd get anything?"

On Saturday, 5 June 1993, defendant returned home. Smith's body was still in the recliner. Defendant then headed to Roanoke Rapids, North Carolina, to play bingo. On three separate occasions between Saturday, 5 June 1993, and Tuesday, 8 June 1993, defendant used Smith's personal checks to write checks to himself. He cashed three of Smith's checks in the amount of $50.00 each at the bingo site and attempted to cash one for $2,500 at a bank, but the teller refused after the signature did not match the signature on file at the bank.

On Tuesday, 8 June 1993, defendant awoke at 3:00 a.m. to the smell of Smith's body, which was still in the recliner. After digging a hole in the stables in the backyard, defendant covered Smith's body in a blanket, dragged it out to the hole, and buried him. Before he buried the body, defendant removed a diamond ring from Smith's hand because defendant "did not have any money." He then drove Smith's car back to Norfolk, Virginia.

On 9 June 1993, defendant drove to Augusta, Georgia, to visit some friends. Defendant's friends testified that defendant drove Smith's car to Georgia. Defendant tried to sell to his friends several items belonging to Smith including the diamond ring, the car, a shotgun, and the .38-caliber pistol with which defendant had shot Smith. Defendant's friends in Augusta, Carlos Petersen and James Yanak, testified that they also saw defendant with Smith's television, VCR, leather jacket, and "a large . . . lump of money."

The following Monday, 14 June 1993, defendant returned to Norfolk, where he pawned Smith's ring. Defendant was later arrested in Norfolk on 24 June 1993.

Beginning on Saturday, 8 June 1993, Smith's relatives could not get in touch with him and soon became concerned. On 10 June 1993,

SBI Agent Malcolm McLeod found in a trash can located in defendant's home a ripped-up personal check of Smith's and a piece of paper on which Smith's name was written several times where defendant had apparently practiced Smith's signature in order to forge Smith's name on his personal checks. Agent Dennis Honeycutt, SBI crime technician, processed Smith's residence, and a luminal test revealed an uninterrupted blood line running from the recliner in the den out a side door towards the backyard. Smith's body was recovered from the grave in the stables in the backyard. Additionally, SBI Agent Jennifer Elwell, a forensic serologist, testified that she examined the gun recovered from under Smith's car seat after defendant was arrested. When she wiped the inside of the gun barrel, she found a positive reaction for blood.

Dr. Marcella F. Fierro, who at the time was a professor of pathology at East Carolina University, performed an autopsy on Smith's body and concluded that the contact gunshot wound to the back of Smith's head was the cause of Smith's death.

Defendant did not present any evidence at the guilt-innocence phase.

During the capital sentencing proceeding, defendant's evidence tended to show from previous psychiatric evaluations that defendant has an adjustment disorder with depressed mood, conversion disorder, a closed head injury, and a history of alcohol abuse. Dr. Billy W. Royal, a medical doctor specializing in psychiatry and forensic psychiatry, testified that his psychological evaluation of defendant revealed that defendant also has a personality disorder with immaturity, impulsivity, and identity problems. Defendant also suffers from chronic depression and an anxiety disorder. Defendant's mother testified that defendant had been sexually abused in the past by his sixteen-year-old uncle and one of his mother's stepsons and had been physically assaulted by one of his six stepfathers. In addition, defendant witnessed his mother attempt suicide and suffer numerous beatings at the hand of her husbands.

## I.

[1] In his first assignment of error, defendant contends that the trial court erred by holding a private, unrecorded conversation outside his presence with prospective juror Sarah White, in violation of his nonwaivable constitutional right to be present at all stages of his capital trial.

STATE v. HARTMAN

[344 N.C. 445 (1996)]

It is well settled that a defendant in a capital trial has an unwaivable right to be present at every stage of his trial. "This Court has repeatedly held that nothing should be done prejudicial to the rights of a person on his trial for a capital felony unless he is actually present . . . ." *State v. Jacobs*, 107 N.C. 772, 779, 11 S.E. 962, 964 (1890). This right to presence derives from the Confrontation Clause of our State Constitution. Significantly, however, any violation of a defendant's right to be present is subject to a harmless error analysis.

*State v. Hudson*, 331 N.C. 122, 135, 415 S.E.2d 732, 738 (1992) (citations omitted), *cert. denied*, 506 U.S. 1055, 122 L. Ed. 2d 136 (1993). "When a trial court conducts private unrecorded conferences with prospective jurors, the trial court commits reversible error unless the State can show that the error was harmless beyond a reasonable doubt." *State v. Lee*, 335 N.C. 244, 262, 439 S.E.2d 547, 555, *cert. denied*, —— U.S. ——, 130 L. Ed. 2d 162 (1994).

At the end of the first day of jury selection, the following exchange, which is a memorialization of the alleged *ex parte* conversation, transpired involving prospective juror White:

THE COURT: Ms. Sarah White, please come around.

(SHE DID AS REQUESTED.)

THE COURT: Gentlemen, this is a juror by the name of Sarah H. White. She was not here at the time the jurors were called. She has brought to me a statement from a doctor. I filed the statement with the clerk and the court is going to defer her service to the next session of Superior Court for Northampton County.

You'll be notified when to return for your services as a juror.

A. I don't have to come back tomorrow?

THE COURT: No, Ma'am.

A. I'll be notified when?

THE COURT: When you're to come back. Anything else?

The State first argues that defendant has not established that an *ex parte* conversation took place. The State suggests that prospective juror White could have brought the doctor's note directly to the clerk and never talked to the judge personally. However, as quoted above, the trial judge uses phrases in the first person, such as "brought *to me*

**STATE v. HARTMAN**

[344 N.C. 445 (1996)]

a statement from a doctor," and "*I* filed the statement with the clerk." (Emphasis added.) Accordingly, we will assume through inference that such a conversation occurred outside defendant's presence.

Defendant argues that this case is guided by *State v. Smith*, 326 N.C. 792, 392 S.E.2d 362 (1990), in which we found prejudicial error where the judge, in defendant's absence, had an *ex parte* conversation with a prospective juror at the bench without any record of what specifically transpired. *Smith* is distinguishable from this case, however, because in *Smith*, we were unable to conduct a harmless error analysis because there was no reconstruction of the questioned conversation's substance.

In resolving this issue, we find that *Lee*, 335 N.C. 244, 439 S.E.2d 547, is analogous to the case at bar. In *Lee*, *ex parte* conversations between the trial judge and two prospective jurors were found to be harmless error. The following conversation transpired when the trial judge in *Lee* instructed the clerk to place twelve jurors in the jury box:

> CLERK: Leonard Fisher, please take the back row seat in the corner, in the orange seat. Sherrill Johnson; Ronda Tatum; Roma Gragg, Your Honor I think that's one you excused—
>
> THE COURT: Yes, sir, I have excused her for medical reasons.

Later during jury selection, the trial court instructed the clerk to call three more prospective jurors to the jury box. At that point, the following transpired:

> CLERK: Karen Holtzclaw take seat number one.
>
> CLERK TAYLOR: Your Honor, she's the one that called this morning and said she had the flu.
>
> THE COURT: Okay, lay her aside.

*Id.* at 262, 439 S.E.2d at 555. These recorded exchanges reveal the substance of the communications between the court and prospective jurors Gragg and Holtzclaw. Consequently, we then held that the trial court properly excused these jurors for medical reasons and that defendant's absence from these communications was harmless beyond a reasonable doubt. *Id.* at 263, 439 S.E.2d at 556.

Here, defendant failed to object to the trial judge's reconstruction of his communications with prospective juror White. As we noted in *Hudson*, "We have no reason to doubt the completeness or accuracy

of the trial court's memorialization, and the lack of any objection by defendant in this regard lends support to this view." *Hudson*, 331 N.C. at 137, 415 S.E.2d at 739-40.

The memorialization in the record facilitates our harmless error review. Like the excused juror in *Lee* and as the trial judge in this case stated, prospective juror White was properly excused based upon medical reasons. Therefore, we hold that defendant's absence from the trial court's private communication with prospective juror White was harmless beyond a reasonable doubt. This assignment of error is overruled.

## II.

[2] Next, defendant contends that the trial court erred in denying defendant's challenge for cause of prospective juror Susan Parker. Defendant argues that Parker's responses to questions regarding her acquaintance with the victim and approximately eight potential witnesses were not candid and demonstrated her inability "to render a fair and impartial verdict" as required by N.C.G.S. § 15A-1212(9). Therefore, defendant contends that he must be given a new trial.

On the second day of jury selection, prospective juror Parker was called to the jury box to be questioned. On initial questioning by the trial court, Parker stated that she had known the victim: "He was a friend of one of my best friends and she kept a pony out there. And we went out there and let the kids ride the pony at his house." In response to the trial court's question regarding whether her acquaintance with Smith would make any difference to her or keep her from being impartial, Parker stated, "No." Parker also stated that she had seen television reports about the case and had discussed it with others but that nothing she had seen or heard would prevent her from fairly considering the evidence. In response to the prosecutor's questioning, Parker indicated that, although she knew people on the list of witnesses who might testify at the trial, her acquaintance with them would have no effect on her and that she would base her verdict on what she heard "from the witness stand and the laws as given to [her] in the case."

After the prosecutor passed Parker to the defense, defense counsel questioned her about the eight potential witnesses whom she stated that she knew. She indicated that some of them were close friends with whom she had discussed the case at different times. The defense counsel asked:

**STATE v. HARTMAN**

[344 N.C. 445 (1996)]

Q. When you were discussing it, did you form any opinion or did you give any opinion?

A. No.

Q. Did the other person, did they give an opinion to you?

A. Yes.

Q. *Do you recall what those opinions were? I'm not asking you what they were. I'm asking you do you recall?*

A. *No, sir.*

(Emphasis added.) Defense counsel next questioned Parker about the extent of her exposure to media coverage. Parker stated that she had followed the case closely in the media and had last read about it in the paper four days before jury selection for the trial began. Defense counsel then returned to the question of Parker's friends and her memory of their opinions about the case.

Q. Do you recall the different positions that the people took that you discussed it with or discussed it with you; is that correct?

A. *Maybe some.*

(Emphasis added.) Parker further testified that her friends were also friends of Smith's, if not related to him. Defense counsel concluded his questioning of Parker as follows:

Q. When your friends or the people that you know come before this stand and the people that you've discussed this matter with, when they come before the court and testify on that jury (sic) stand there, do you feel that you must give more weight to their testimony?

A. No.

Q. You kind of know what they're going to say because you've heard them discuss it, do you not?

A. Yes.

Q. You pretty much know their position on the matter; is that right?

A. Yes.

Q. There's nothing wrong with you having an opinion, but do you have an opinion in this matter?

A. No.

Q. No opinion whatsoever?

A. No.

Q. Do you have any opinion as to what the punishment should be in the matter?

A. No, because I don't know all the facts.

Q. Have you thought about what the punishment should be?

A. No.

Following questioning by defense counsel, defendant challenged Parker for cause, which the trial court again denied. Defendant then exercised one of his fourteen peremptory challenges, and Parker was excused. Defendant subsequently exhausted his peremptory challenges and renewed his challenge for cause of Parker, which the trial court again denied.

It has long been held that the "granting of a challenge for cause rests in the sound discretion of the trial court." *State v. Cunningham*, 333 N.C. 744, 753, 429 S.E.2d 718, 723 (1993). "As a rule, we will therefore not disturb the trial court's ruling on a challenge for cause absent a showing of an abuse of that discretion." *Id.* at 754, 429 S.E.2d at 723. "In order to preserve an assignment of error from a denial of a challenge for cause, defendant must follow the procedures set out in N.C.G.S. § 15A-1214(h)." *Id.* at 746, 429 S.E.2d at 719. "The statutory method for preserving a defendant's right to seek appellate relief when a trial court refuses to allow a challenge for cause is mandatory and is the only method by which such rulings may be preserved for appellate review." *State v. Sanders*, 317 N.C. 602, 608, 346 S.E.2d 451, 456 (1986).

N.C.G.S. § 15A-1214(h) states as follows:

(h) In order for a defendant to seek reversal of the case on appeal on the ground that the judge refused to allow a challenge made for cause, he must have:

(1) Exhausted the peremptory challenges available to him;

(2) Renewed his challenge as provided in subsection (i) of this section; and

(3) Had his renewal motion denied as to the juror in question.

N.C.G.S. § 15A-1214(h) (1988). N.C.G.S. § 15A-1214(i) provides:

(i) A party who has exhausted his peremptory challenges may move orally or in writing to renew a challenge for cause previously denied if the party either:

(1) Had peremptorily challenged the juror; or

(2) States in the motion that he would have challenged that juror peremptorily had his challenges not been exhausted.

N.C.G.S. § 15A-1214(i).

"A defendant must show both an abuse of discretion *and* prejudice to establish reversible error relating to *voir dire*." *State v. Frye*, 341 N.C. 470, 494, 461 S.E.2d 664, 675 (1995) (emphasis added), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 526 (1996). If defendant is able to establish that the trial judge abused his discretion in denying defendant's challenge for cause, as mandated by N.C.G.S. § 15A-1214(h) and (i), he then must establish that he was prejudiced by such error.

In *State v. Watson*, 310 N.C. 384, 312 S.E.2d 448 (1984), we restated the common law rule for establishing prejudice:

"Where the court has refused to stand aside a juror challenged for cause, and the party has then peremptorily challenged him, in order to get the benefit of his exception he must exhaust his remaining peremptory challenges, and then challenge another juror peremptorily to show his dissatisfaction with the jury, and except to the refusal of the court to allow it."

*Id.* at 396, 312 S.E.2d at 456 (quoting *State v. Allred*, 275 N.C. 554, 563, 169 S.E.2d 833, 838 (1969)). Moreover, this Court further explained the common law rule by stating that "no ruling relating to the qualification of jurors and growing out of challenges to the polls will be reviewed on appeal, unless the appellant has exhausted his peremptory challenges and then undertakes to challenge another juror." *State v. Levy*, 187 N.C. 581, 587, 122 S.E. 386, 390 (1924), *quoted in State v. Young*, 287 N.C. 377, 389, 214 S.E.2d 763, 772 (1975), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976). The purpose for challenging the additional juror is to establish prejudice by show-

ing that appellant was forced to seat a juror whom he did not want because of the exhaustion of his peremptory challenges.

Having thoroughly reviewed the transcript of the jury selection phase, we find that defendant has satisfied the mandates of N.C.G.S. § 15A-1214(h) by (1) challenging prospective juror Parker for cause, which the trial court denied; (2) exhausting his peremptory challenges; and (3) renewing his challenge for cause as to Parker, which the trial court also denied. *Cunningham*, 333 N.C. at 746, 429 S.E.2d at 719.

In challenging a juror for cause:

N.C.G.S. § 15A-1212, entitled "Grounds for challenge for cause," provides in pertinent part:

A challenge for cause to an individual juror may be made by any party on the ground that the juror:

. . . .

(8) As a matter of conscience, regardless of the facts and circumstances, would be unable to render a verdict with respect to the charge in accordance with the law of North Carolina.

(9) *For any other cause is unable to render a fair and impartial verdict.*

N.C.G.S. § 15A-1212(8) codifies the rule of the United States Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 20 L. Ed. 2d 776 (1968). *See State v. Kennedy*, 320 N.C. 20, 26, 357 S.E.2d 359, 363 (1987).

*Cunningham*, 333 N.C. at 746, 429 S.E.2d at 719 (emphasis added). Thus, it is only when "a juror's answers show that he could not follow the law as given to him by the judge in his instructions to the jury[] [that] it is error *not* to excuse such a juror." *State v. Hightower*, 331 N.C. 636, 641, 417 S.E.2d 237, 240 (1992) (emphasis added).

[3] Defendant argues that Parker's *voir dire* responses demonstrate her inability to be an impartial juror based on her conflicting testimony regarding her knowledge of her friends' "positions" about the case. In *State v. Benson*, 323 N.C. 318, 324, 372 S.E.2d 517, 520 (1988), we held that mere acquaintance with witnesses alone was not a sufficient basis for a challenge for cause.

## STATE v. HARTMAN

[344 N.C. 445 (1996)]

In support of his argument that Parker's acquaintance with Smith and the potential witnesses demonstrates her inability to render a fair and impartial verdict, defendant relies on *State v. Lee*, 292 N.C. 617, 234 S.E.2d 574 (1977). In *Lee*, the *voir dire* examination of prospective juror Norvell revealed that Norvell was married to a police officer, knew most of the police officers in the area, was a friend of other officers and their wives, and knew the State's chief investigating officer. When asked whether she would possibly believe certain police officers' testimony more than somebody she did not know, Norvell stated, "I would have a tendency to." *Id.* at 620, 234 S.E.2d at 576. Norvell answered that she thought she could be a fair and impartial juror, but again reiterated that there was a "possibility" that she might give more weight to the testimony of the police officers with whom she was acquainted over that of a witness whom she did not know. *Id.* at 621, 234 S.E.2d at 576-77. This Court found an abuse of discretion in the trial court's failure to grant defendant's challenge for cause as to Norvell. We based this decision on Norvell's inability to serve as a disinterested and impartial juror because of her relationships with witnesses. Because defendant had already exhausted his peremptory challenges, he was forced to accept Norvell as a juror at his trial.

In the case *sub judice*, regardless of whether Parker recalled the witnesses' positions or opinions, the issue is whether Parker could remain a fair and impartial juror. The record shows that Parker never fluctuated in her clear and decisive answers with both the trial court and the prosecutor that she could remain a fair and impartial juror. While defendant never asked Parker if her acquaintance with the potential witnesses and Smith would impair her ability to be fair and impartial, when asked by defense counsel if she had any opinion as to what defendant's punishment should be, she responded, "No, because I don't know all the facts." The trial court, after hearing Parker's responses, observing her demeanor, and assessing her credibility, in its discretion, made the decision to reject.defendant's challenge for cause of Parker. Thus, defendant has failed to demonstrate that the trial court abused its discretion in denying defendant's challenge for cause of Parker.

As we previously stated, "In a criminal appeal the burden is on the appellant to show *both* error and prejudice." *Young*, 287 N.C. at 389, 214 S.E.2d at 772 (emphasis added). However, defendant having failed to establish that the trial court abused its discretion in denying his challenge for cause of Parker, we are not now required to perform a prejudice analysis.

This assignment of error is overruled.

### III.

**[4]** In his third assignment of error, defendant contends that the trial judge erred while questioning a prospective juror during *voir dire*. Defendant argues that the trial judge's questioning constituted an impermissible expression of opinion in violation of N.C.G.S. § 15A-1222. Defendant also argues that the judge's comments violated his constitutional right to an impartial jury by discouraging other prospective jurors from disclosing any possible influence outside the evidence admitted at trial. We find no merit in defendant's argument.

During *voir dire* by the prosecutor, prospective juror Jones Wheeler, one of the first twelve jurors called to the jury box, testified that he had discussed the case with three potential witnesses whom he knew because they all served together on the rescue squad and fire department. The following exchange ensued:

Q. Have you formed an opinion based on what they said as to the guilt or innocence of the defendant?

A. I haven't formed an opinion. I haven't heard all the facts.

Q. What you've heard—would you feel like that would influence your decision in this case? Would that have a bearing on your decision in this case or not?

A. Possibly.

THE COURT: You understand that what you've heard was not under oath at this trial?

A. I realize that.

THE COURT: And it's not evidence in the case?

A. But when you are associated with people you work with—

THE COURT: Just answer my questions, sir. Do you understand that it's not evidence in the case?

A. Yes, sir.

THE COURT: What you heard was at the rescue squad or from rescue squad members. And you're saying you're going to let that enter into your deliberations and your decision as to whether or not this defendant's guilty or not guilty? Is that what you're telling me?

A. It's pretty hard sometimes to separate the things.

STATE v. HARTMAN

[344 N.C. 445 (1996)]

THE COURT: Well, are you saying that you're going to—if you're selected, that you're likely to make up your verdict based on what you heard down on the street corner rather than the evidence in the courtroom?

A. I didn't say that, but it could influence it.

THE COURT: Well, how would it influence you, sir, if it's not going to affect your verdict? If you're not going to consider it in your—as to your verdict, how would it influence you?

A. From what the witnesses may say here on the witness stand along with what I've already heard.

THE COURT: All right. Go ahead, Mr. Beard.

N.C.G.S. § 15A-1222 provides: "The judge may not express during any stage of the trial[] any opinion in the presence of the jury on any question of fact to be decided by the jury." N.C.G.S. § 15A-1222 (1988). Defendant concedes that the trial court's opinion did not relate to any question of fact to be decided by the jury. However, he argues nonetheless, in reliance on *State v. Canipe*, 240 N.C. 60, 81 S.E.2d 173 (1954), that the statute should be construed broadly to reach beyond expressions of opinion regarding questions of fact. We find *Canipe* distinguishable from the case at bar. In *Canipe*, the trial judge alluded to the facts and outcomes of other first-degree murder trials, and this Court found that these comments would have implied to the jurors the trial judge's opinion on the propriety of the death penalty in the case before them. We held that the trial judge's comparison between the case at issue and other cases necessitated a new trial.

Here, the trial judge alluded only to appropriate sources of evidence, in no way suggesting how such evidence should be considered by the jurors. After carefully reviewing the transcript, we hold that the trial judge's statements did not convey any personal opinion which he may have had concerning Wheeler's sources of influence. The only purpose which the judge was trying to serve through his communications was an earnest effort to clarify prospective juror Wheeler's intentions when Wheeler said that extrajudicial information could "possibly" influence his verdict. *See State v. Rogers*, 316 N.C. 203, 217, 341 S.E.2d 713, 722 (1986) (holding that the trial court's questioning of a prospective juror was not an expression of opinion but rather an attempt to clarify the prospective juror's actual position on the issue of capital punishment), *overruled on other grounds by State v. Vandiver*, 321 N.C. 570, 364 S.E.2d 373 (1988); *State v.*

*Simmons*, 286 N.C. 681, 685, 213 S.E.2d 280, 284 (1975) (holding that "the trial judge in the exercise of his duty to supervise and control the trial so as to insure a fair trial to all parties had the right and duty to interrogate prospective jurors in order to clarify their answers"), *death sentence vacated*, 428 U.S. 903, 49 L. Ed. 2d 1208 (1976). In *Rogers*, we stated, "[w]e fail to see how the trial judge's inquiry or his ruling excusing the juror for cause could be construed as an improper expression of an opinion which might have unfairly influenced the views of the other jurors." 316 N.C. at 217, 341 S.E.2d at 722. We reach the same conclusion here.

Defendant further argues that his constitutional right to an impartial jury was violated because the trial judge's demeanor toward prospective juror Wheeler discouraged other prospective jurors from disclosing any possible influence from factors outside the evidence.

In the present case, it is mere speculation that the other prospective jurors were discouraged from disclosing any possible influence outside the evidence admitted at trial due to the trial judge's remarks. The trial judge was simply clarifying prospective juror Wheeler's ambiguous admission that he "possibly" might be influenced by information about the case he learned from three potential witnesses. This assignment of error is without merit.

## IV.

[5] In his next assignment of error, defendant contends that the trial judge committed reversible error by commenting on the relevance of mitigating evidence in open court in the jurors' presence and, as a result, violated defendant's constitutional right to a fair and impartial jury trial and to jury consideration of mitigating evidence. We disagree.

Defendant posits that the trial judge improperly expressed an opinion when he responded to defense counsel's request to have defendant's mother, Ms. Simpson, show the jury scars on her wrists which resulted from her numerous suicide attempts. After Ms. Simpson testified that she had attempted suicide by slitting her wrists thirty times, defense counsel requested permission for Ms. Simpson to show the jury her wrists. The trial judge responded by saying, "I guess so. *I don't see how that's relevant*, but step down and show them your wrists." (Emphasis added.)

On appeal to this Court, defendant contends that the trial judge's comment regarding the relevancy of Ms. Simpson's showing her scars

was an improper expression of opinion of the relevancy of her suicide attempts as mitigating evidence, in violation of N.C.G.S. § 15A-1222. He argues that "[i]t is extremely unlikely that jurors understood the italicized portion of the court's remark as anything other than an opinion that the evidence . . . was irrelevant to the capital sentencing decision. Jurors would not have made the fine if not impossible distinction between the relevance of the demonstration, which was tangible evidence of the suicide attempts, and the relevance of the attempts themselves."

It is well established that it is "the duty of the [trial] judge to expedite the trial and to question the irrelevancy or redundancy of evidence." *State v. Currie*, 293 N.C. 523, 531, 238 S.E.2d 477, 482 (1977) (no error where the trial judge commented, "I fail to see any relevance to this," when the defendant was eliciting testimony concerning a trophy the defendant's softball team won). As stated above, N.C.G.S. § 15A-1222 provides in pertinent part that "[t]he judge may not express during any stage of the trial[] any opinion in the presence of the jury on any question of fact to be decided by the jury."

We note at the outset that whether Ms. Simpson had scars on her wrists was not a question of fact for the jury to decide. Contrary to defendant's contention, we believe that the trial court's comment was not directed at the relevance of her alleged suicide attempts as mitigating evidence. It is more likely that the trial court was merely commenting on the relevance of Ms. Simpson having to show the jury the scars on her wrists as evidence of her suicide attempts. As we stated in *State v. Perry*, 231 N.C. 467, 57 S.E.2d 774 (1950):

> The comment made or the question propounded should be considered in the light of all the facts and attendant circumstances disclosed by the record, and unless it is apparent that such infraction of the rules might reasonably have had a prejudicial effect on the result of the trial, the error will be considered harmless.

*Id.* at 471, 57 S.E.2d at 777.

In *State v. Conrad*, 275 N.C. 342, 168 S.E.2d 39 (1969), this Court held that a trial judge's expression of opinion on evidence did not constitute prejudicial error where, on cross-examination, a State's witness stated that after she "split up" with the defendant, she "took a bunch of pills and cut [her] arm," and then, over the prosecutor's objection, the trial court stated, "I don't see the relevancy, but I don't see the harm. Objection overruled." *Id.* at 349, 168 S.E.2d at 44. This

Court stated, "The chance remark that the judge failed to see relevancy does not amount to prejudicial error." *Id.*

Finally, as the eleventh mitigating circumstance, the trial court submitted and the jury found that "[t]he defendant witnessed physical and verbal abuse of his mother, her abuse of drugs and alcohol and an attempted suicide." Thus, it is obvious that the trial court did not persuade the jury that the suicide attempts were irrelevant at the sentencing phase. This assignment of error is overruled.

## V.

**[6]** In his fifth assignment of error, defendant contends that the trial court committed reversible constitutional error by refusing to submit specific nonstatutory mitigating circumstances requested by defendant in writing. He argues that the instructions given by the trial court kept the jury from considering relevant mitigating evidence.

Defendant requested in writing four statutory mitigating circumstances. The fourth statutory mitigating circumstance was the catchall mitigating circumstance that the jury may consider "any other circumstance or circumstances arising from the evidence which [they] deem[ed] to have mitigating value." N.C.G.S. § 15A-2000(f)(9) (Supp. 1995). Under the (f)(9) mitigating circumstance, defendant listed thirty-three nonstatutory mitigating circumstances. The trial court refused to submit the circumstances in the manner defendant requested and instead combined several of defendant's proposed nonstatutory mitigating circumstances into single statements of mitigation, resulting in the submission of four statutory mitigating circumstances and eight nonstatutory mitigating circumstances to the jury. In addition, the trial court submitted as a separate mitigating circumstance the (f)(9) catchall mitigating circumstance, to permit the jurors to give effect to any additional mitigating circumstances that they found to have mitigating value. In simplifying the presentation of nonstatutory mitigating circumstances, the trial court omitted two of defendant's proposed nonstatutory mitigating circumstances, believing that they were subsumed into the other mitigating circumstances it submitted to the jury.

Defendant first argues that by using the conjunction "and" to combine two or more proposed nonstatutory mitigating circumstances into one statement of mitigation, the trial court prevented the jury from considering all of his mitigating evidence. Therefore, according to defendant, unless a juror found all the elements making

up a submitted nonstatutory mitigating circumstance and found each element to have mitigating value, the juror could not give effect to any one of the elements in the combined statement. In response to defendant's contentions, the State argues that when the instructions are read in context with the format used on the Issues and Recommendation as to Punishment form, it is obvious that the trial court's merging of the mitigating circumstances did not prevent the sentencing jury from considering and giving effect to any mitigating evidence offered by defendant. We agree.

At the outset, we note that it is well settled that "there is no . . . constitutional requirement of unfettered sentencing discretion in the jury, and States are free to structure and shape consideration of mitigating evidence, 'in an effort to achieve a more rational and equitable administration of the death penalty.' " *Boyde v. California*, 494 U.S. 370, 377, 108 L. Ed. 2d 316, 327 (1990) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 181, 101 L. Ed. 2d 155, 170 (1988)).

In *State v. Cummings*, 326 N.C. 298, 389 S.E.2d 66 (1990), this Court held that

> where a defendant makes a timely *written* request for a listing *in writing* on the form of possible nonstatutory mitigating circumstances that are supported by the evidence and which the jury could reasonably deem to have mitigating value, the trial court must put such circumstances in writing on the [Issues and Recommendation as to Punishment] form.

*Id.* at 324, 389 S.E.2d at 80.

When reviewing the instruction for error, the Court must construe it contextually. "[I]n determining the propriety of the trial judge's charge to the jury, the reviewing court must consider the instructions in their entirety, and not in detached fragments." *State v. Wright*, 302 N.C. 122, 127, 273 S.E.2d 699, 703 (1981); *see also State v. Davis*, 321 N.C. 52, 59, 361 S.E.2d 724, 728 (1987) ("In reviewing jury instructions for error, this Court has held that they must be considered in their entirety."). " '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' *Cupp v. Naughten*, 414 U.S. 141, 146-47, 38 L. Ed. 2d 368, 373 (1973)." *State v. McNeil*, 327 N.C. 388, 392, 395 S.E.2d 106, 109 (1990), *cert. denied*, 499 U.S. 942, 113 L. Ed. 2d 459 (1991).

Essentially, defendant challenges the trial court's failure to submit the nonstatutory mitigating circumstances as he had requested

them in four categories: (1) defendant's sexual molestation and physical assault; (2) defendant's unstable and dysfunctional upbringing and home; (3) defendant's mother's abusive relationships, her substance abuse, and her attempted suicides; and (4) defendant's confession and cooperation with law enforcement officers upon his arrest and interrogation. With respect to the first category, defendant proposed four separate nonstatutory mitigating circumstances which described defendant's (1) sexual molestation by older adult males, (2) sexual molestation by the son of one of his grandmother's eight former husbands, (3) defendant's physical assaults, and (4) defendant's history of closed head injury. The trial court condensed the four nonstatutory mitigating circumstances into the following: "Consider whether the defendant was sexually molested and physically assaulted during his formative years." The jury did not find this mitigating circumstance to exist or to have mitigating value.

Based upon our review of the record, the evidence does not support each of the requested nonstatutory mitigating circumstances as written. There was no evidence in the record that defendant was molested by "older adult males." Assuming *arguendo* that the evidence fully supported each of the proposed circumstances, defendant's proposed mitigating circumstances were subsumed in the trial court's version of the nonstatutory mitigating circumstance as it was submitted. *See Benson*, 323 N.C. at 327, 372 S.E.2d at 522 (no error when trial court fails to submit a mitigating circumstance that was subsumed into other nonstatutory mitigating circumstances).

In the next category, defendant requested four separate nonstatutory mitigating circumstances describing (1) his lack of control over the chaotic and violent home in which he was raised, (2) his lack of a meaningful relationship with his father since birth, (3) his transient upbringing because of his mother's six marriages, and (4) his dysfunctional home. Because all of these circumstances as requested are duplicative, the trial court properly consolidated these proposed circumstances into a single mitigating circumstance, submitting the following to the jury: "Consider whether the defendant came from a broken and dysfunctional home, moved often, and had no male guidance or father figure in his formative years." "The refusal [of a trial judge] to submit proposed circumstances separately and independently . . . [is] not error." *State v. Greene*, 324 N.C. 1, 21, 376 S.E.2d 430, 443 (1989), *sentence vacated on other grounds*, 494 U.S. 1022, 108 L. Ed. 2d 603 (1990).

Next, defendant challenges the trial court's failure to submit four proposed nonstatutory mitigating circumstances regarding (1) the physical and verbal abuse inflicted on defendant's mother by "several" of defendant's stepfathers in his presence; (2) the suicide attempts by defendant's mother that defendant witnessed in his "formative years"; (3) the psychological counseling defendant received because of his mother's suicide attempts; and (4) defendant's introduction to alcohol by various family members, including his mother, which resulted in his becoming an alcoholic early in his life. The trial court submitted, "Consider whether the defendant witnessed physical and verbal abuse of his mother, her abuse of drugs and alcohol and an attempted suicide." Again, the evidence did not support each of defendant's proposed nonstatutory mitigating circumstances. There was no evidence that defendant witnessed his mother being abused by "several" of his mother's husbands, just one of them. Nor was there any evidence that defendant's mother attempted suicide in defendant's formative years. There was no evidence that defendant was introduced to alcohol by anyone other than his mother. Finally, the evidence supported a finding that defendant received counseling because of his sexual abuse, but not because of his mother's suicide attempts. Thus, it was not error for the trial court to refuse to submit the proposed mitigating circumstances as defendant had written them.

In the fourth category, defendant requested four nonstatutory mitigating circumstances regarding (1) his cordial and polite demeanor during police interrogation, (2) his voluntary confession, (3) his assistance in locating and delivering evidence to police officers, and (4) his cooperation with law enforcement officers upon his arrest and interrogation. The trial court submitted, "Consider whether the defendant confessed upon his arrest and was polite to and cooperative with law enforcement officers and assisted in location of evidence." Each nonstatutory mitigating circumstance as written by defendant was covered under the circumstance submitted by the trial court. The use of the conjunctive form did not prevent the jury from considering all of defendant's evidence in mitigation related to his confession. *Frye*, 341 N.C. at 507-09, 461 S.E.2d at 684; *State v. Payne*, 337 N.C. 505, 526-29, 448 S.E.2d 93, 105-07 (1994), *cert. denied*, —— U.S. ——, 131 L. Ed. 2d 292 (1995).

With respect to defendant's contention that the trial court erred in failing to submit in any form two of his proposed nonstatutory mitigating circumstances, we disagree. Defendant requested as a non-

statutory mitigating circumstance that "[s]everal members of the Defendant's immediate family were alcoholics to include his father, his mother, his sister, and his grandmother." The trial court submitted, "Consider whether the defendant is an alcoholic." Defendant argues that the manner in which the trial court submitted this non-statutory mitigating circumstance precluded the jury's consideration of "defendant's genetic predisposition to alcohol abuse." He states, "Without this focus, the fact of [defendant's] alcoholism was more likely to be viewed simply as weakness or unmitigated choice."

Defendant also requested as a nonstatutory mitigating circumstance that "[d]uring his formative years[,] the Defendant was removed from several schools because of his mother's several marriages and moves." The trial court submitted, "the defendant discontinued school at the age of 16." Defendant argues that the reason for defendant's "generally dismal experience in school—family transience and instability—" should have been submitted as a mitigating circumstance.

As we have previously stated, it is not error for a trial court to refuse to submit a requested nonstatutory mitigating circumstance that has been incorporated into another mitigating circumstance that has been submitted. *Benson*, 323 N.C. at 327, 372 S.E.2d at 521-22. In *State v. Green*, 336 N.C. 142, 443 S.E.2d 14, *cert. denied*, ——U.S. ——, 130 L. Ed. 2d 547 (1994), we found that certain submitted mitigating circumstances as well as the (f)(9) catchall mitigating circumstance provided a vehicle for the jury to consider all of the evidence tending to support a requested nonstatutory mitigating circumstance which was not submitted. We held that the trial court's error in failing to submit the defendant's requested nonstatutory mitigating circumstance was harmless beyond a reasonable doubt because it was clear that the jury was not prevented from considering any potential mitigating evidence. *Id.* at 183, 443 S.E.2d at 38; *accord State v. Hill*, 331 N.C. 387, 417, 417 S.E.2d 765, 780 (1992), *cert. denied*, 507 U.S. 924, 122 L. Ed. 2d 684 (1993).

Likewise, in the case at bar, the jury was not precluded from considering any mitigating evidence. The jury was always free to consider any evidence under the (f)(9) catchall mitigating circumstance. *State v. McLaughlin*, 341 N.C. 426, 448, 462 S.E.2d 1, 12 (1995) ("the jury could have given this evidence mitigating value under the catchall mitigating circumstance, N.C.G.S. § 15A-2000(f)(9)"), *cert. denied*, —— U.S. ——, 133 L. Ed. 2d 879 (1996). Therefore, assuming

STATE v. HARTMAN

[344 N.C. 445 (1996)]

*arguendo* that the trial court erred in not submitting the omitted proposed mitigating circumstances, the error was harmless beyond a reasonable doubt.

In summary, after a careful and thorough review of the record, we conclude that defendant was not denied the benefit of any of his proposed nonstatutory mitigating circumstances. Those that were supported by the evidence were submitted to the jury in substance, and those that were not supported by the evidence were not submitted to the jury. Viewed contextually, the substance of the mitigating circumstances that defendant requested was subsumed into other submitted mitigating circumstances, including the (f)(9) catchall mitigating circumstance. The jury was not precluded from considering any of defendant's mitigating evidence. Thus, the trial court did not err in refusing to submit defendant's mitigating circumstances as requested. Any error is deemed harmless.

This assignment of error is overruled.

## VI.

[7] By this assignment of error, defendant contends that he is entitled to a new sentencing hearing because the prosecutor sought to inflame the jurors by bringing before them defendant's purported homosexuality in an effort to undercut the evidence of defendant's sexual abuse.

During jury selection, the prosecutor asked the first twelve veniremembers whether "the sexual persuasion of someone[] would . . . have any bearing upon [their] decision in this case." Defendant immediately objected, and the trial court sustained defendant's objection. Subsequently, during cross-examination of defendant's aunt, the prosecutor had her clarify an earlier response on direct examination concerning her knowledge that defendant had been sexually abused as a child. She testified that she had heard about the abuse but that she herself had no direct knowledge of it. The prosecutor then asked, "Well, you knew that Mr. Hartman is a homosexual. You've heard that." Defendant objected, and after sustaining defendant's objection, the trial court instructed the jury to disregard the improper statement of the prosecutor. Then the prosecutor asked, "Did you know what sexual persuasion the defendant was?" Again, defense counsel objected, and the trial court sustained the objection.

In response to defendant's contention, the State contends that defendant's engagement in homosexual activity with State's witness

Richard Prince shortly after he murdered Smith was not consistent with defendant's evidence of remorsefulness. Thus, according to the State, the real purpose for asking about defendant's sexual persuasion was to rebut defendant's evidence of remorsefulness.

The assignment of error here parallels an issue raised in *State v. Moore*, 276 N.C. 142, 171 S.E.2d 453 (1970), for which this Court held no error because curative instructions were given. In *Moore*, one of the State's witnesses stated four times and his wife one time that the defendant had admitted to them that he had previously killed one person. On each of these five occasions, the trial court struck the witnesses' unresponsive answer from the record. This Court stated, "We do not, therefore, deem this evidence so inherently prejudicial that its initial impact—whatever it was—could not have been erased by the judge's prompt and emphatic instructions that the jury should not consider the testimony for any purpose whatsoever." *Id.* at 149, 171 S.E.2d at 458.

Here, the prosecutor's questions regarding defendant's sexual persuasion were never answered. Moreover, this Court has stated that where the trial court properly instructed the jury not to consider certain evidence, our system of justice is based upon the assumption that trial jurors are women and men " 'of character and of sufficient intelligence to fully understand and comply with the instructions of the court, and are presumed to have done so.' " *Id.* (quoting *State v. Ray*, 212 N.C. 725, 729, 194 S.E. 482, 484 (1938)). Thus, any error was corrected by the trial court's prompt curative instructions.

This assignment of error is overruled.

## VII.

[8] In his seventh assignment of error, defendant contends that the trial court erred by failing to submit the lesser included offense of larceny when it charged the jury on robbery with a firearm during the guilt-innocence phase of the trial. Defendant does not contest the sufficiency of the evidence to support submission of the offense of robbery-felony murder and robbery with a firearm. Rather, defendant argues that a reasonable jury could have concluded that defendant lacked the necessary intent for robbery at the time of the killing, thus demonstrating that the killing and the taking of property were not one continuous transaction. Therefore, because no continuous transaction occurred, according to defendant, he was entitled to an instruction on larceny, and the trial court's failure to so instruct the jury was

error and requires the case to be remanded either for a new trial on the offense of robbery and, potentially, a new sentencing hearing, or for a new trial on robbery and the imposition of a life sentence for the first-degree murder conviction.

During the charge conference, defendant requested that larceny be submitted to the jury because it "could find him guilty of larceny." The trial court denied his request. Subsequently, the jury found defendant guilty of first-degree murder based upon premeditation and deliberation and under the felony murder rule with robbery as the underlying felony. The phrases "armed robbery," "robbery with a firearm," and "robbery with a dangerous weapon" are used interchangeably. *See State v. Bishop*, 343 N.C. 518, 563, 472 S.E.2d 842, 866 (1996); *State v. Handy*, 331 N.C. 515, 527, 419 S.E.2d 545, 551 (1992).

> Under N.C.G.S. § 14-87(a), robbery with a dangerous weapon is: "(1) the unlawful taking or an attempt to take personal property from the person or in the presence of another (2) by use or threatened use of a firearm or other dangerous weapon (3) whereby the life of a person is endangered or threatened."

*State v. Olson*, 330 N.C. 557, 566, 411 S.E.2d 592, 597 (1992) (quoting *State v. Beaty*, 306 N.C. 491, 496, 293 S.E.2d 760, 764 (1982), *overruled on other grounds by State v. White*, 322 N.C. 506, 369 S.E.2d 813 (1988)); *see* N.C.G.S. § 14-87 (1993). " 'Force or intimidation occasioned by the use or threatened use of firearms, is the main element of the offense.' " *Beaty*, 306 N.C. at 496, 293 S.E.2d at 764 (quoting *State v. Mull*, 224 N.C. 574, 576, 31 S.E.2d 764, 765 (1944)).

> Before the trial court [is] allowed to submit robbery with a dangerous weapon . . . , it [is] required to find that substantial evidence would support a finding that [defendant's] use of a dangerous weapon preceded or was concomitant with the taking, "or [was] so joined by time and circumstances with the taking as to be part of one continuous transaction."

*State v. Brewton*, 342 N.C. 875, 877-78, 467 S.E.2d 395, 397 (1996) (quoting *Olson*, 330 N.C. at 566, 411 S.E.2d at 597).

Larceny is a lesser included offense of robbery with a dangerous weapon. *White*, 322 N.C. at 514, 369 S.E.2d at 817. "There is a special relationship between armed robbery and larceny. Both crimes involve an unlawful and willful taking of another's personal property. We have

said that armed robbery is an aggravated form of larceny." *Id.* at 516, 369 S.E.2d at 818. "To convict of larceny, there must be proof that defendant (a) took the property of another; (b) carried it away; (c) *without the owner's consent*; and (d) *with the intent to deprive the owner of his property permanently.*" *Id.* at 518, 369 S.E.2d at 819. However, as we have often stated, "[a] trial court must submit and instruct the jury on a lesser included offense when, and only when, there is evidence from which the jury could find that defendant committed the lesser included offense." *State v. Boykin*, 310 N.C. 118, 121, 310 S.E.2d 315, 317 (1984), *quoted in White*, 322 N.C. at 512, 369 S.E.2d at 816. But where the State adequately establishes all the elements of a crime and defendant produces no evidence sufficient to negate these elements, "[t]he mere possibility that the jury could return with a negative finding does not, without more, require the submission of the lesser included offense." *Cummings*, 326 N.C. at 317, 389 S.E.2d at 77. "The test in every case involving the propriety of an instruction on a lesser grade of an offense is not whether the jury could convict defendant of the lesser crime, but whether the State's evidence is positive as to each element of the crime charged and whether there is any conflicting evidence relating to any of these elements." *State v. Leroux*, 326 N.C. 368, 378, 390 S.E.2d 314, 322, *cert. denied*, 498 U.S. 871, 112 L. Ed. 2d 155 (1990).

Applying the foregoing principles to the case *sub judice*, we conclude that the State introduced substantial evidence of defendant's guilt of robbery with a firearm and that the trial court did not err by refusing to charge on the lesser included offense of larceny. Defendant's confession provides ample support for finding that "defendant's use of the gun was so joined by time and circumstances to the taking as to make the use of the gun and the taking parts of one continuous transaction." *Olson*, 330 N.C. at 567, 411 S.E.2d at 597.

In his second confession, defendant, who recanted his initial statement that the shooting was accidental, stated:

Herman was sitting in a recliner in the den. I picked the gun up off the table, walked up behind Herman, pointed the gun at the back of Herman's head. The sight of blood makes me sick so I turned my head and at very close range, pulled the trigger and shot Herman Smith in the back of the head.

I dropped the gun and went to the phone and started to dial my mom's phone number. Before I finished dialing the phone I hung the phone up and went over to Herman. I saw the blood and

saw Herman was not breathing. I got sick and went to the bathroom and threw up.

I went back out, sat at the kitchen table, and laid the gun up there. My mind was racing a hundred miles an hour. I thought about calling the police or paramedics and I thought what have I done. The only thought that came to my mind was to get the hell out of there.

I got a change of clothes, the pistol, my dog, and took Herman's car to Norfolk.

Additionally, the State's evidence tended to show that defendant had expressed to a friend months before the shooting his thoughts about killing Smith to get his money. Subsequently, shortly after the murder, defendant asked his mother whether she would receive anything upon Smith's death. Defendant took Smith's gun and his car immediately following the murder. Several witnesses testified that defendant attempted to sell Smith's gun and car after the murder. All the evidence tended to show that defendant intended to permanently deprive Smith of the property he took.

> The evidence is sufficient to support a charge of felony murder based on the underlying offense of armed robbery where the jury may reasonably infer that the killing and the taking of the victim's property were part of one continuous chain of events. Neither the commission of armed robbery, as defined by N.C.G.S. § 14-87(a), nor the commission of felony murder based on armed robbery depends upon whether the intention to commit the taking of the victim's property was formed before or after the killing. Under N.C.G.S. § 14-17, a killing is committed in the perpetration of armed robbery when there is no break in the chain of events between the taking of the victim's property and the force causing the victim's death, so that the taking and the homicide are part of the same series of events, forming one continuous transaction.

*Handy*, 331 N.C. at 529, 419 S.E.2d at 552 (citations omitted).

In this case, there is simply no evidence to support defendant's contention that he formed the intent to take Smith's property at a time which could not be part of a continuous transaction. The State's evidence is uncontroverted as to each element of armed robbery and "[t]aking the evidence in the light most favorable to defendant, we conclude that the elements of violence and taking nevertheless were so joined in time and circumstances that the trial court did not err by

refusing to instruct the jury on the lesser included offenses." *Brewton*, 342 N.C. at 878, 467 S.E.2d at 397.

This assignment of error is overruled.

## VIII.

[9] In his next assignment of error, defendant disputes the manner in which the trial court instructed the jury on the N.C.G.S. § 15A-2000(f)(2) mitigating circumstance that the murder was "committed while the defendant was under the influence of mental or emotional disturbance." None of the jurors found this mitigating circumstance to exist. Defendant contends that the trial court's use of the conjunction "and" in listing the potentially supporting evidence conditioned a finding of the circumstance on a finding of all the listed factors. Because defendant did not object at trial, this Court's review is limited to plain error.

The trial court instructed the jury on the (f)(2) mitigating circumstance as follows:

You would find this mitigating circumstance if you find that the defendant suffered from post[-]traumatic headache disorder, alcohol abuse and dependency, personality and anxiety disorder, *and* chronic depression, and that as a result, the defendant was under the influence of mental and emotional disturbance when he killed the victim.

(Emphasis added.)

Defendant claims that the trial court's instruction may have precluded consideration of mitigating evidence. We disagree.

"[T]he court is not required to summarize all of the evidence in its charge to the jury." *Payne*, 337 N.C. at 527, 448 S.E.2d at 106. The trial court's instruction clearly comported with defendant's mitigating evidence. Dr. Royal testified that defendant suffered from posttraumatic headache disorder; alcohol abuse and dependency; personality disorder with immaturity, impulsivity, and identity problems; chronic depression; and anxiety disorder. "[T]herefore, the instruction in the conjunctive basically accorded with defendant's evidence and was not plain error." *Id.*

Moreover, the trial court also instructed the jury that "[f]or this mitigating circumstance to exist, it is enough that the defendant's

STATE v. HARTMAN

[344 N.C. 445 (1996)]

mind or emotions were disturbed from *any* cause and that he was under the influence of the disturbance when he killed the victim." (Emphasis added.) The trial court's instruction as given did not preclude the jury from considering mitigating evidence but, instead, allowed the jury to consider one or all of defendant's psychological problems as presented at trial. *See Frye*, 341 N.C. at 508, 461 S.E.2d at 684 (no error where the trial court instructed the jury with a conjunctive on the factual bases potentially supporting the (f)(2) circumstance and stated that "it is enough that the defendant's mind or emotions were disturbed from any cause"); *see also Hill*, 331 N.C. at 419, 417 S.E.2d at 781 (holding that the trial court's instruction did not improperly limit consideration of mental or emotional disturbance mitigating circumstance to brain damage in light of language included in the instruction that "it is enough that the defendant's mind or emotions were disturbed, from any cause").

This assignment of error is overruled.

## IX.

**[10]** Defendant next contends that the trial court erred by sentencing defendant to a forty-year term on the robbery conviction by finding as an aggravating factor that "[t]he victim was very . . . old." N.C.G.S § 15A-1340.4(a)(1)(j) (1988) (repealed effective 1 October 1994; reenacted as N.C.G.S. § 15A-1340.16(d)(11) effective 1 October 1994). Defendant claims that the aggravating factor did not apply to this case because "there was no evidence that the victim was more vulnerable to the commission of the offense by reason of his age." We disagree.

A victim's age does not make a defendant more blameworthy unless the victim's age causes the victim to be more vulnerable than he or she otherwise would be to the crime committed against him or her, as where age impedes a victim from fleeing, fending off attack, recovering from its effects, or otherwise avoiding being victimized.

*State v. Hines*, 314 N.C. 522, 525, 335 S.E.2d 6, 8 (1985). "As this Court observed in *State v. Ahearn*, 307 N.C. 584, 603, 300 S.E.2d 689, 701 (1983) (emphasis in original), *'vulnerability* is clearly the concern addressed by this factor [of the victim's age].' " *Hines*, 314 N.C. at 526, 335 S.E.2d at 8 (alterations in original).

Although the record is not clear as to Smith's exact age, he was somewhere between seventy-two and seventy-seven years old at the

time of the murder. In addition, the evidence tended to show that Smith suffered from emphysema and relied on inhalers at all times. Smith had limited use of one arm and weighed only ninety-three pounds at the time of the autopsy. Further, Smith had provided defendant with shelter, food, cigarettes, beer, and transportation when defendant had nowhere else to go. Despite all that Smith had done for defendant, defendant took advantage of Smith's trust. Smith's age, physical disabilities, and stature made him vulnerable and an inviting target for the physically superior twenty-eight-year-old defendant.

Thus, the trial court properly found from this evidence that Smith's age was an aggravating factor. Defendant's assignment of error is, therefore, overruled.

## X.

Defendant also raises six additional issues, which he acknowledges this Court has previously decided adversely to his position. He raises these issues for the purpose of preserving them for possible further judicial review of this case. We have carefully considered defendant's arguments on these issues and find no compelling reason to depart from our prior holdings. Therefore, we overrule these assignments of error.

## XI.

[11] Having concluded that defendant's capital sentencing proceeding was free from prejudicial error, we turn to the duties reserved exclusively for this Court in capital cases by N.C.G.S. § 15A-2000(d)(2). It is our duty in this regard to ascertain (1) whether the record supports the jury's findings of the aggravating circumstance on which the sentence of death was based; (2) whether the death sentence was entered under the influence of passion, prejudice, or other arbitrary considerations; and (3) whether the death sentence is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant. N.C.G.S. § 15A-2000(d)(2).

In the case *sub judice*, the jury found defendant guilty of first-degree murder based upon premeditation and deliberation and under the felony murder rule. The jury found as an aggravating circumstance that the murder was committed by defendant while defendant was engaged in the commission of robbery with a firearm. N.C.G.S.

§ 15A-2000(e)(5). The jury found as a statutory mitigating circumstance that defendant had no significant history of prior criminal activity. N.C.G.S. § 15A-2000(f)(1). The jury also found as nonstatutory mitigating circumstances (1) that defendant is an alcoholic; (2) that defendant confessed upon his arrest and was polite to and cooperative with law enforcement officers and assisted in locating evidence; (3) that defendant came from a broken and dysfunctional home, moved often, and had no male guidance or father figure in his formative years; and (4) that defendant witnessed physical and verbal abuse of his mother, her abuse of drugs and alcohol, and an attempted suicide.

We have thoroughly examined the record, transcripts, and briefs in the present case and conclude that the evidence fully supports the aggravating circumstance found by the jury that the murder was committed by defendant while defendant was engaged in the commission of robbery with a firearm. N.C.G.S. § 15A-2000(e)(5). Further, we find no indication that the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary consideration.

Although defendant made no argument that his death sentence is disproportionate, we are nevertheless mandated by N.C.G.S. § 15A-2000(d)(2) to conduct proportionality review. We turn then to our final statutory duty of proportionality review.

"In our proportionality review, it is proper to compare the present case with other cases in which this Court has concluded that the death penalty was disproportionate." *State v. Burke*, 343 N.C. 129, 162, 469 S.E.2d 901, 918 (1996). We have found the death penalty disproportionate in seven cases. *Benson*, 323 N.C. 318, 372 S.E.2d 517; *State v. Stokes*, 319 N.C. 1, 352 S.E.2d 653 (1987); *Rogers*, 316 N.C. 203, 341 S.E.2d 713; *State v. Young*, 312 N.C. 669, 325 S.E.2d 181 (1985); *State v. Hill*, 311 N.C. 465, 319 S.E.2d 163 (1984); *State v. Bondurant*, 309 N.C. 674, 309 S.E.2d 170 (1983); *State v. Jackson*, 309 N.C. 26, 305 S.E.2d 703 (1983). We conclude that this case is not substantially similar to any case in which this Court has found the death penalty disproportionate.

In *Benson, Jackson*, and *Stokes*, the defendants either pled guilty or were convicted by the jury solely under the theory of felony murder. Here, defendant was convicted based upon the theory of felony murder and of premeditation and deliberation. This Court has stated that "[t]he finding of premeditation and deliberation indicates a more cold-blooded and calculated crime." *State v. Artis*, 325 N.C. 278, 341,

384 S.E.2d 470, 506 (1989), *sentence vacated on other grounds*, 494 U.S. 1023, 108 L. Ed. 2d 604 (1990).

In *Rogers*, defendant mistakenly shot the victim during an argument with the victim's friend. Here, defendant intentionally shot the victim.

This case is also distinguishable from *Young*, where the jury found aggravating circumstances that the defendant committed the murder for pecuniary gain and during the commission of a robbery. In *Young*, defendant stabbed a man twice in the chest in order to get money to buy liquor. The Court noted, however, that the defendant's accomplice actually "finished" the victim by stabbing him several more times. *Young*, 312 N.C. at 688, 325 S.E.2d at 193. Here, defendant clearly shot the gun and murdered Smith.

In *Hill*, the aggravating circumstance found was that the offense was committed against a law enforcement officer engaged in the performance of his official duties. This Court vacated the sentence of death due in part to the speculative nature of the evidence and the defendant's lack of motive. In the case at bar, the evidence was not speculative and tended to show that defendant's motive for killing Smith was for monetary gain.

Significantly, in *Bondurant*, the defendant shot the victim but then immediately sought medical attention to help the victim. Here, defendant made no attempts to seek medical assistance for Smith; he instead left Smith for several days following the murder in the recliner in which he was sitting when defendant shot him.

> It is also proper to compare this case to those where the death sentence was found proportionate. *[State v.] McCollum*, 334 N.C. [208,] 244, 433 S.E.2d [144,] 164 [(1993), *cert. denied*, —— U.S. ——, 129 L. Ed. 2d 895 (1994)]. Although we have repeatedly stated that we review all of the cases in the pool when engaging in our statutory duty, it is worth noting again that "we will not undertake to discuss or cite all of those cases each time we carry out our duty." *Id.*

*Burke*, 343 N.C. at 162, 469 S.E.2d at 918.

This Court's opinion in *State v. Carter*, 342 N.C. 312, 464 S.E.2d 272 (1995), *cert. denied*, —— U.S. ——, 134 L. Ed. 2d 957 (1996), provides a set of facts and circumstances similar in many respects to the case at bar. This Court in *Carter* upheld a death sentence where defendant was found guilty of first-degree murder based upon

theories of premeditation and deliberation and felony murder with the underlying felony of robbery with a dangerous weapon. In *Carter*, "[d]efendant killed [the victim] for fifteen dollars to enable him to buy crack cocaine which he smoked while [the victim] lay dead on her living room floor." *Id.* at 329, 464 S.E.2d at 283. The victim was seventy-one years old and suffered from cancer and emphysema. This Court stated, "Defendant chose to kill a person who had treated him with kindness and compassion, for whom he had done yard work in the past, and who had been his neighbor for quite some time . . . . At 5'2 1/2" tall and 119 pounds, she was no match for defendant, a healthy twenty-four-year-old man." *Id.*

In the present case, the evidence tended to show that Smith, an elderly man with poor health, had befriended twenty-eight-year-old defendant, taken him into his home, and offered him respect and goodwill, just as the victim did to defendant in *Carter*. Furthermore, defendant took Smith's belongings and attained money by using the victim's personal checks throughout several days following the murder while leaving Smith's body in the recliner in which he was murdered.

Finally, we note that the victims in both *Carter* and the case *sub judice* were killed in the solace of their own homes. A murder in the home "shocks the conscience, not only because a life was senselessly taken, but because it was taken [at] an especially private place, one [where] a person has a right to feel secure." *State v. Brown*, 320 N.C. 179, 231, 358 S.E.2d 1, 34, *cert. denied*, 484 U.S. 970, 98 L. Ed. 2d 406 (1987).

After reviewing the cases, we conclude that based on the nature of this crime, particularly the circumstances noted above, we cannot conclude as a matter of law that the sentence of death was disproportionate. We also conclude that the present case is more similar to certain cases in which we have found the sentence of death proportionate than to those in which we have found the sentence disproportionate or those in which juries have consistently returned recommendations of life imprisonment.

Having considered and rejected all of defendant's assignments of error, we hold that defendant received a fair capital sentencing proceeding, free from prejudicial error. After comparing this case to other similar cases in which the death penalty was imposed and considering both the crime and defendant, we cannot hold as a matter of law that the death sentence was disproportionate or excessive.

Therefore, the sentence of death entered against defendant must be and is left undisturbed.

NO ERROR.